809 F.2d 195
 89 A.L.R.Fed. 217, 55 USLW 2401, 17
Envtl. L. Rep. 20,580
 In re UNION CARBIDE CORPORATION GAS PLANT DISASTER AT
BHOPAL, INDIA IN DECEMBER, 1984.
The PLAINTIFFS IN ALL CASES WHICH HAVE BEEN CONSOLIDATED
INTO THIS PROCEEDING BY ORDER OF THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION dated February 6, 1985, and Order
of this Court dated April 25, 1985, together with those
Plaintiffs in all other related actions which may be
consolidated subsequent to the filing of this notice of
appeal, including but not limited to all those cases which
are all those tort cases filed in this Court which the
undersigned are aware of, except The Union of India v. Union
Carbide Corporation, No. 85 Civ. 2696 and except those cases
consolidated as shareholders or derivative cases by
Executive Committee Members, Stanley M. Chesley and F. Lee
Bailey, and the Union of India, Plaintiffs-Appellants, Cross-Appellees,
v.
UNION CARBIDE CORPORATION, Defendant-Appellee, Cross-Appellant.
 Nos. 301, 383 and 496, Docket 86-7517, 86-7589 and 86-7637.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 24, 1986.
Decided Jan. 14, 1987.
 
 Stanley M. Chesley, Cincinnati, Ohio, Waite Schneider, Bayless and Chesley Co., L.P.A., Cincinnati, Ohio, and F. Lee Bailey, New York City (Jack S. Hoffinger (Liaison Counsel), Hoffinger, Friedland, Dobrish, Bernfeld & Hasen, New York City, of counsel; Phillip B. Allen, Cincinatti, Ohio, Arnold Levin, David J. Perlman, Howard J. Sedran, Philadelphia, Pa., Michael C. Zwal, on brief), Howard Beach, N.Y., for appellant individual plaintiffs.
 Bud G. Holman, New York City (William Krohley, Robert E. Crotty, Lisa E. Cleary, Kelley Drye & Warren, New York City, of counsel), for Union Carbide Corp.
 Michael V. Ciresi, Minneapolis, Minn. (Bruce A. Finzen, Robert M. Wattson, Roberta B. Walburn, Robins, Zelle, Larson & Kaplan, Minneapolis, Minn. (D.S. Sastri, Silver Springs, Md.); Gerald A. Novack, Barrett, Smith, Schapiro, Simon & Armstrong, New York City, of counsel), for The Union of India.
 Rob Hager, Washington, D.C. for amicus curiae Christic Institute.
 Before MANSFIELD, PRATT and ALTIMARI, Circuit Judges.
 MANSFIELD, Circuit Judge:*
 
 
 1
 This appeal raises the question of whether thousands of claims by citizens of India and the Government of India arising out of the most devastating industrial disaster in history--the deaths of over 2,000 persons and injuries of over 200,000 caused by lethal gas known as methyl isocyanate which was released from a chemical plant operated by Union Carbide India Limited (UCIL) in Bhopal, India--should be tried in the United States or in India. The Southern District of New York, John F. Keenan, Judge, granted the motion of Union Carbide Corporation (UCC), a defendant in some 145 actions commenced in federal courts in the United States, to dismiss these actions on grounds of forum non conveniens so that the claims may be tried in India, subject to certain conditions. The individual plaintiffs appeal from the order and the court's denial of their motion for a fairness hearing on a proposed settlement. UCC and the Union of India (UOI), a plaintiff, cross-appeal. We eliminate two of the conditions imposed by the district court and in all other respects affirm that court's orders.
 
 
 2
 The accident occurred on the night of December 2-3, 1984, when winds blew the deadly gas from the plant operated by UCIL into densely occupied parts of the city of Bhopal. UCIL is incorporated under the laws of India. Fifty and nine-tenths percent of its stock is owned by UCC, 22% is owned or controlled by the government of India, and the balance is held by approximately 23,500 Indian citizens. The stock is publicly traded on the Bombay Stock Exchange. The company is engaged in the manufacture of a variety of products, including chemicals, plastics, fertilizers and insecticides, at 14 plants in India and employs over 9,000 Indian citizens. It is managed and operated entirely by Indians in India.
 
 
 3
 Four days after the Bhopal accident, on December 7, 1984, the first of some 145 purported class actions in federal district courts in the United States was commenced on behalf of victims of the disaster. On January 2, 1985, the Judicial Panel on Multidistrict Litigation assigned the actions to the Southern District of New York where they became the subject of a consolidated complaint filed on June 28, 1985.
 
 
 4
 In the meantime, on March 29, 1985, India enacted the Bhopal Gas Leak Disaster (Processing of Claims) Act, granting to its government, the UOI, the exclusive right to represent the victims in India or elsewhere. Thereupon the UOI, purporting to act in the capacity of parens patriae, and with retainers executed by many of the victims, on April 8, 1985, filed a complaint in the Southern District of New York on behalf of all victims of the Bhopal disaster, similar to the purported class action complaints already filed by individuals in the United States. The UOI's decision to bring suit in the United States was attributed to the fact that, although numerous lawsuits (by now, some 6,500) had been instituted by victims in India against UCIL, the Indian courts did not have jurisdiction over UCC, the parent company, which is a defendant in the United States actions. The actions in India asserted claims not only against UCIL but also against the UOI, the State of Madhya Pradesh, and the Municipality of Bhopal, and were consolidated in the District Court of Bhopal.
 
 
 5
 By order dated April 25, 1985, Judge Keenan appointed a three-person Executive Committee to represent all plaintiffs in the pre-trial proceedings. It consisted of two lawyers representing the individual plaintiffs and one representing the UOI. On July 31, 1985, UCC moved to dismiss the complaints on grounds of forum non conveniens, the plaintiffs' lack of standing to bring the actions in the United States, and their purported attorneys' lack of authority to represent them. After several months of discovery related to forum non conveniens,[1] the individual plaintiffs and the UOI opposed UCC's motion. After hearing argument on January 3, 1986, the district court, on May 12, 1986, 634 F.Supp. 842, in a thoroughly reasoned 63-page opinion granted the motion, dismissing the lawsuits before it on condition that UCC:
 
 
 6
 (1) consent to the jurisdiction of the courts of India and continue to waive defenses based on the statute of limitations,
 
 
 7
 (2) agree to satisfy any judgment rendered by an Indian court against it and upheld on appeal, provided the judgment and affirmance "comport with the minimal requirements of due process," and
 
 
 8
 (3) be subject to discovery under the Federal Rules of Civil Procedure of the United States.
 
 
 9
 On June 12, 1986, UCC accepted these conditions subject to its right to appeal them; and on June 24, 1986, the district court entered its order of dismissal. In September 1986 the UOI, acting pursuant to its authority under the Bhopal Act, brought suit on behalf of all claimants against UCC and UCIL in the District Court of Bhopal, where many individual suits by victims of the disaster were then pending.
 
 
 10
 In its opinion dismissing the actions the district court analyzed the forum non conveniens issues, applying the standards and weighing the factors suggested by the Supreme Court in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 955 (1947), and Piper Aircraft Co. v. Reyno, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). At the outset Judge Keenan concluded, in accordance with the Court's expressed views in Piper that, since the plaintiffs were not residents of the United States but of a foreign country, their choice of the United States as a forum would not be given the deference to which it would be entitled if this country were their home. See Piper, 454 U.S. at 256, 102 S.Ct. at 266. Following the dictates of Piper, the district court declined to compare the advantages and disadvantages to the respective parties of American versus Indian Laws or to determine the impact upon plaintiffs' claims of the laws of India, where UCC had acknowledged that it would make itself amenable to process, except to ascertain whether India provided an adequate alternative forum, as distinguished from no remedy at all. Judge Keenan reviewed thoroughly the affidavits of experts on India's law and legal system, which described in detail its procedural and substantive aspects, and concluded that, despite some of the Indian system's disadvantages, it afforded an adequate alternative forum for the enforcement of plaintiffs' claims.
 
 
 11
 The Indian judiciary was found by the court to be a developed, independent and progressive one, which has demonstrated its capability of circumventing long delays and backlogs prevalent in the Indian courts' handling of ordinary cases by devising special expediting procedures in extraordinary cases, such as by directing its High Court to hear them on a daily basis, appointing special tribunals to handle them, and assigning daily hearing duties to a single judge. He found that Indian courts have competently dealt with complex technological issues. Since the Bhopal Act provides that the case may be treated speedily, effectively and to the best advantage of the claimants, and since the Union of India represents the claimants, the prosecution of the claims is expected to be adequately staffed by the Attorney General or Solicitor General of India.
 
 
 12
 The tort law of India, which is derived from common law and British precedent, was found to be suitable for resolution of legal issues arising in cases involving highly complex technology. Moreover, Indian courts would be in a superior position to construe and apply applicable Indian laws and standards than would courts of the United States. Third parties may be interpleaded under Order 1, Rule 10(2) of the Indian Code of Civil Procedure, and defendants may seek contribution from third parties. The absence in India of a class action procedure comparable to that in federal courts here was found not to deprive the plaintiffs of a remedy, in view of existing Indian legal authorization for "representative" suits under Order 1, Rule 8 of the Indian Code of Civil Procedure, which would permit an Indian court to create representative classes. Judge Keenan further found that the absence of juries and contingent fee arrangements in India would not deprive the claimants of an adequate remedy.
 
 
 13
 In two areas bearing upon the adequacy of the Indian forum the district court decided to impose somewhat unusual conditions on the transfer of the American cases to India. One condition dealt with pre-trial discovery. Indian courts, following the British pattern, permit parties to have pre-trial discovery of each other through written interrogatories, liberal inspection of documents and requests for admissions. Non-party witnesses can be interviewed and summoned to appear at trial or to produce documents. See India Code Civ.Proc., Order 16, Rule 6. Witnesses unable to appear at trial are sometimes permitted to give evidence by means of affidavits. See id. Order 19. Discovery in India, however, as in Britain, is limited to evidence that may be admitted at trial. Litigants are not permitted to engage in wide-ranging discovery of the type authorized by Fed.R.Civ.P. 26(b), which allows inquiry into any unprivileged matter that could reasonably lead to the discovery of admissible evidence.
 
 
 14
 Judge Keenan, concluding that the Indian system might limit the victims' access to sources of proof, directed that dismissal of the actions on grounds of forum non conveniens must be conditioned on UCC's consent to discovery of it in accordance with the Federal Rules of Civil Procedure after the cases were transferred to India. He added, "While the Court feels that it would be fair to bind the plaintiffs to American discovery rules, too, it has no authority to do so."
 
 
 15
 Another condition imposed by the district court upon dismissal on grounds of forum non conveniens dealt with the enforceability in the United States of any judgment rendered by an Indian court in the cases. Judge Keenan, expressing the view that an Indian judgment might possibly not be enforceable in the United States, provided in his order that UCC must "agree to satisfy any judgment rendered by an Indian court, and if applicable, upheld by an appellate court in that country, where such judgment and affirmance comport with the minimal requirements of due process."
 
 
 16
 As the district court found, the record shows that the private interests of the respective parties weigh heavily in favor of dismissal on grounds of forum non conveniens. The many witnesses and sources of proof are almost entirely located in India, where the accident occurred, and could not be compelled to appear for trial in the United States. The Bhopal plant at the time of the accident was operated by some 193 Indian nationals, including the managers of seven operating units employed by the Agricultural Products Division of UCIL, who reported to Indian Works Managers in Bhopal. The plant was maintained by seven functional departments employing over 200 more Indian nationals. UCIL kept at the plant daily, weekly and monthly records of plant operations and records of maintenance as well as records of the plant's Quality Control, Purchasing and Stores branches, all operated by Indian employees. The great majority of documents bearing on the design, safety, start-up and operation of the plant, as well as the safety training of the plant's employees, is located in India.[2] Proof to be offered at trial would be derived from interviews of these witnesses in India and study of the records located there to determine whether the accident was caused by negligence on the part of the management or employees in the operation of the plant, by fault in its design, or by sabotage. In short, India has greater ease of access to the proof than does the United States.
 
 
 17
 The plaintiffs seek to prove that the accident was caused by negligence on the part of UCC in originally contributing to the design of the plant and its provision for storage of excessive amounts of the gas at the plant. As Judge Keenan found, however, UCC's participation was limited and its involvement in plant operations terminated long before the accident. Under 1973 agreements negotiated at arm's-length with UCIL, UCC did provide a summary "process design package" for construction of the plant and the services of some of its technicians to monitor the progress of UCIL in detailing the design and erecting the plant. However, the UOI controlled the terms of the agreements and precluded UCC from exercising any authority to "detail design, erect and commission the plant," which was done independently over the period from 1972 to 1980 by UCIL process design engineers who supervised, among many others, some 55 to 60 Indian engineers employed by the Bombay engineering firm of Humphreys and Glasgow. The preliminary process design information furnished by UCC could not have been used to construct the plant. Construction required the detailed process design and engineering data prepared by hundreds of Indian engineers, process designers and sub-contractors. During the ten years spent constructing the plant, its design and configuration underwent many changes.
 
 
 18
 The vital parts of the Bhopal plant, including its storage tank, monitoring instrumentation, and vent gas scrubber, were manufactured by Indians in India. Although some 40 UCIL employees were given some safety training at UCC's plant in West Virginia, they represented a small fraction of the Bhopal plant's employees. The vast majority of plant employees were selected and trained by UCIL in Bhopal. The manual for start-up of the Bhopal plant was prepared by Indians employed by UCIL.
 
 
 19
 In short, the plant has been constructed and managed by Indians in India. No Americans were employed at the plant at the time of the accident. In the five years from 1980 to 1984, although more than 1,000 Indians were employed at the plant, only one American was employed there and he left in 1982. No Americans visited the plant for more than one year prior to the accident, and during the 5-year period before the accident the communications between the plant and the United States were almost non-existent.
 
 
 20
 The vast majority of material witnesses and documentary proof bearing on causation of and liability for the accident is located in India, not the United States, and would be more accessible to an Indian court than to a United States court. The records are almost entirely in Hindi or other Indian languages, understandable to an Indian court without translation. The witnesses for the most part do not speak English but Indian languages understood by an Indian court but not by an American court. These witnesses could be required to appear in an Indian court but not in a court of the United States. Although witnesses in the United States could not be subpoenaed to appear in India, they are comparatively few in number and most are employed by UCC which, as a party, would produce them in India, with lower overall transportation costs than if the parties were to attempt to bring hundreds of Indian witnesses to the United States. Lastly, Judge Keenan properly concluded that an Indian court would be in a better position to direct and supervise a viewing of the Bhopal plant, which was sealed after the accident. Such a viewing could be of help to a court in determining liability issues.
 
 
 21
 After a thorough review, the district court concluded that the public interest concerns, like the private ones, also weigh heavily in favor of India as the situs for trial and disposition of the cases. The accident and all relevant events occurred in India. The victims, over 200,000 in number, are citizens of India and located there. The witnesses are almost entirely Indian citizens. The Union of India has a greater interest than does the United States in facilitating the trial and adjudication of the victims' claims. Despite the contentions of plaintiffs and amici that it would be in the public interest to avoid a "double standard" by requiring an American parent corporation (UCC) to submit to the jurisdiction of American courts, India has a stronger countervailing interest in adjudicating the claims in its courts according to its standards rather than having American values and standards of care imposed upon it.
 
 
 22
 India's interest is increased by the fact that it has for years treated UCIL as an Indian national, subjecting it to intensive regulations and governmental supervision of the construction, development and operation of the Bhopal plant, its emissions, water and air pollution, and safety precautions. Numerous Indian government officials have regularly conducted on-site inspections of the plant and approved its machinery and equipment, including its facilities for storage of the lethal methyl isocyanate gas that escaped and caused the disaster giving rise to the claims. Thus India has considered the plant to be an Indian one and the disaster to be an Indian problem. It therefore has a deep interest in ensuring compliance with its safety standards. Moreover, plaintiffs have conceded that in view of India's strong interest and its greater contacts with the plant, its operations, its employees, and the victims of the accident, the law of India, as the place where the tort occurred, will undoubtedly govern. In contrast, the American interests are relatively minor. Indeed, a long trial of the 145 cases here would unduly burden an already overburdened court, involving both jury hardship and heavy expense. It would face the court with numerous practical difficulties, including the almost impossible task of attempting to understand extensive relevant Indian regulations published in a foreign language and the slow process of receiving testimony of scores of witnesses through interpreters.
 
 
 23
 Having made the foregoing findings, Judge Keenan dismissed the actions against UCC on grounds of forum non conveniens upon the conditions indicated above, after obtaining UCC's consent to those conditions subject to its right to appeal the order. After the plaintiffs filed their notice of appeal, UCC and the Union of India filed cross appeals.
 
 
 24
 Upon these appeals, the plaintiffs continue to oppose the dismissal. The Union of India, however, has changed its position and now supports the district court's order. UCC, as it did in the district court, opposes as unfair the condition that it submit to discovery pursuant to the Federal Rules of Civil Procedure without reciprocally obligating the plaintiffs and Union of India to be subject to discovery on the same basis so that both sides might be treated equally, giving each the same access to the facts in the others' possession.
 
 
 25
 Upon argument of the appeal, UCC also took the position that the district court's order requiring it to satisfy any Indian court judgment was unfair unless some method were provided, such as continued availability of the district court as a forum, to ensure that any denial of due process by the Indian courts could be remedied promptly by the federal court here rather than delay resolution of the issue until termination of the Indian court proceedings and appeal, which might take several years. UCC's argument in this respect was based on the sudden issuance by the Indian court in Bhopal of a temporary order freezing all of UCC's assets, which could have caused it irreparable injury if it had been continued indefinitely,[3] and by the conflict of interest posed by the UOI's position in the Indian courts where, since the UOI would appear both as a plaintiff and a defendant, it might as a plaintiff voluntarily dismiss its claims against itself as a defendant or, as a co-defendant with UCC, be tempted to shed all blame upon UCC even though the UOI had in fact been responsible for supervision, regulation and safety of UCIL's Bhopal plant.
 
 DISCUSSION
 
 26
 The standard to be applied in reviewing the district court's forum non conveniens dismissal was clearly expressed by the Supreme Court in Piper Aircraft Co. v. Reyno, supra, 454 U.S. at 257, 102 S.Ct. at 266, as follows:
 
 
 27
 The forum non conveniens determination is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference.
 
 
 28
 Having reviewed Judge Keenan's detailed decision, in which he thoroughly considered the comparative adequacy of the forums and the public and private interests involved, we are satisfied that there was no abuse of discretion in his granting dismissal of the action. On the contrary, it might reasonably be concluded that it would have been an abuse of discretion to deny a forum non conveniens dismissal. See Schertenleib v. Traum, 589 F.2d 1156, 1164 (2d Cir.1978); De Oliveira v. Delta Marine Drilling Co., 707 F.2d 843 (5th Cir.1983) (per curiam). Practically all relevant factors demonstrate that transfer of the cases to India for trial and adjudication is both fair and just to the parties.
 
 
 29
 Plaintiffs' principal contentions in favor of retention of the cases by the district court are that deference to the plaintiffs' choice of forum has been inadequate, that the Indian courts are insufficiently equipped for the task, that UCC has its principal place of business here, that the most probative evidence regarding negligence and causation is to be found here, that federal courts are much better equipped through experience and procedures to handle such complex actions efficiently than are Indian courts, and that a transfer of the cases to India will jeopardize a $350 million settlement being negotiated by plaintiffs' counsel. All of these arguments, however, must be rejected.
 
 
 30
 Little or no deference can be paid to the plaintiffs' choice of a United States forum when all but a few of the 200,000 plaintiffs are Indian citizens located in India who, according to the UOI, have revoked the authorizations of American counsel to represent them here and have substituted the UOI, which now prefers Indian courts. The finding of our district court, after exhaustive analysis of the evidence, that the Indian courts provide a reasonably adequate alternative forum cannot be labelled clearly erroneous or an abuse of discretion.
 
 
 31
 The emphasis placed by plaintiffs on UCC's having its domicile here, where personal jurisdiction over it exists, is robbed of significance by its consent to Indian jurisdiction. Plaintiffs' contention that the most crucial and probative evidence is located in the United States is simply not in accord with the record or the district court's findings. Although basic design programs were prepared in the United States and some assistance furnished to UCIL at the outset of the 10-year period during which the Bhopal plant was constructed, the proof bearing on the issues to be tried is almost entirely located in India. This includes the principal witnesses and documents bearing on the development and construction of the plant, the detailed designs, the implementation of plans, the operation and regulation of the plant, its safety precautions, the facts with respect to the accident itself, and the deaths and injuries attributable to the accident.
 
 
 32
 Although the plaintiffs' American counsel may at one time have been close to reaching a $350 million settlement of the cases, no such settlement was ever finalized. No draft joint stipulation in writing or settlement agreement appears to have been prepared, much less approved by the parties. No petition for certification of a settlement class under Fed.R.Civ.P. 23 has ever been presented. See Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). Most important, the UOI, which is itself a plaintiff and states that it now represents the Indian plaintiffs formerly represented by American counsel, is firmly opposed to the $350 million "settlement" as inadequate. Under these circumstances, to order a Rule 23 "fairness" hearing would be futile. The district court's denial of the American counsels' motion for such a hearing must accordingly be affirmed.
 
 
 33
 The conditions imposed by the district court upon its forum non conveniens dismissal stand on a different footing. Plaintiffs and the UOI, however, contend that UCC, having been granted the forum non conveniens dismissal that it sought and having consented to the district court's order, has waived its right to appellate review of these conditions. We disagree. UCC expressly reserved its right to appeal Judge Keenan's order. Moreover, it has made a sufficient showing of prejudice from the second and third conditions of the court's order to entitle it to seek appellate review. UCC's position is comparable to that of a prevailing party which, upon being granted injunctive relief, is permitted to challenge by appeal conditions attaching to the injunction that are found to be objectionable. United States v. Bedford Assocs., 618 F.2d 904, 913-16 (2d Cir.1980). Similarly, conditions imposed by the court upon dismissals without prejudice under Fed.R.Civ.P. 41(a)(2) may be appealed by the plaintiff when they prejudice the plaintiff. LeCompte v. Mr. Chip, Inc., 528 F.2d 601 (5th Cir.1976).
 
 
 34
 All three conditions of the dismissal are reviewable since plaintiffs have appealed the district court's order and UCC has cross-appealed "from each judgment and order appealed in whole or part by any plaintiff." We therefore have jurisdiction over the entire case and may in the interests of justice modify the district court's order. Cf. In re Barnett, 124 F.2d 1005, 1009 (2d Cir.1942) ("We are clear that we have the power to order a reversal as to [parties in interest] even though they did not appeal."); Hysell v. Iowa Pub. Serv. Co., 559 F.2d 468, 476 (8th Cir.1977) ("Once a timely notice of appeal has been filed from a judgment, it gives us jurisdiction to review the entire judgment; rules requiring separate appeals by other parties are rules of practice, which may be waived in the interest of justice where circumstances so require.") (citing In re Barnett, supra ).
 
 
 35
 The first condition, that UCC consent to the Indian court's personal jurisdiction over it and waive the statute of limitations as a defense, are not unusual and have been imposed in numerous cases where the foreign court would not provide an adequate alternative in the absence of such a condition. See, e.g., Schertenleib, supra, 589 F.2d at 1166; Bailey v. Dolphin Int'l, Inc., 697 F.2d 1268, 1280 (5th Cir.1983). The remaining two conditions, however, pose problems.
 
 
 36
 In requiring that UCC consent to enforceability of an Indian judgment against it, the district court proceeded at least in part on the erroneous assumption that, absent such a requirement, the plaintiffs, if they should succeed in obtaining an Indian judgment against UCC, might not be able to enforce it against UCC in the United States. The law, however, is to the contrary. Under New York law, which governs actions brought in New York to enforce foreign judgments, see Island Territory of Curacao v. Solitron Devices, Inc., 489 F.2d 1313, 1318 (2d Cir.1973), cert. denied, 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974), a foreign-country judgment that is final, conclusive and enforceable where rendered must be recognized and will be enforced as "conclusive between the parties to the extent that it grants or denies recovery of a sum of money" except that it is not deemed to be conclusive if:
 
 
 37
 1. the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;
 
 
 38
 2. the foreign court did not have personal jurisdiction over the defendant.
 
 
 39
 Art. 53, Recognition of Foreign Country Money Judgments, 7B N.Y.Civ.Prac.L. & R. Secs. 5301-09 (McKinney 1978). Although Sec. 5304 further provides that under certain specified conditions a foreign country judgment need not be recognized,[4] none of these conditions would apply to the present cases except for the possibility of failure to provide UCC with sufficient notice of proceedings or the existence of fraud in obtaining the judgment, which do not presently exist but conceivably could occur in the future.[5]
 
 
 40
 UCC contends that Indian courts, while providing an adequate alternative forum, do not observe due process standards that would be required as a matter of course in this country. As evidence of this apprehension it points to the haste with which the Indian court in Bhopal issued a temporary order freezing its assets throughout the world and the possibility of serious prejudice to it if the UOI is permitted to have the double and conflicting status of both plaintiff and co-defendant in the Indian court proceedings. It argues that we should protect it against such denial of due process by authorizing Judge Keenan to retain the authority, after forum non conveniens dismissal of the cases here, to monitor the Indian court proceedings and be available on call to rectify in some undefined way any abuses of UCC's right to due process as they might occur in India.
 
 
 41
 UCC's proposed remedy is not only impractical but evidences an abysmal ignorance of basic jurisdictional principles, so much so that it borders on the frivolous. The district court's jurisdiction is limited to proceedings before it in this country. Once it dismisses those proceedings on grounds of forum non conveniens it ceases to have any further jurisdiction over the matter unless and until a proceeding may some day be brought to enforce here a final and conclusive Indian money judgment. Nor could we, even if we attempted to retain some sort of supervisory jurisdiction, impose our due process requirements upon Indian courts, which are governed by their laws, not ours. The concept of shared jurisdictions is both illusory and unrealistic. The parties cannot simultaneously submit to both jurisdictions the resolution of the pre-trial and trial issues when there is only one consolidated case pending in one court. Any denial by the Indian courts of due process can be raised by UCC as a defense to the plaintiffs' later attempt to enforce a resulting judgment against UCC in this country.
 
 
 42
 We are concerned, however, that as it is written the district court's requirement that UCC consent to the enforcement of a final Indian judgment, which was imposed on the erroneous assumption that such a judgment might not otherwise be enforceable in the United States, may create misunderstandings and problems of construction. Although the order's provision that the judgment "comport with the minimal requirements of due process" (emphasis supplied) probably is intended to refer to "due process" as used in the New York Foreign Country Money Judgments Law and others like it, there is the risk that it may also be interpreted as providing for a lesser standard than we would otherwise require. Since the court's condition with respect to enforceability of any final Indian judgment is predicated on an erroneous legal assumption and its "due process" language is ambiguous, and since the district court's purpose is fully served by New York's statute providing for recognition of foreign-country money judgments, it was error to impose this condition upon the parties.
 
 
 43
 We also believe that the district court erred in requiring UCC to consent (which UCC did under protest and subject to its right of appeal) to broad discovery of it by the plaintiffs under the Federal Rules of Civil Procedure when UCC is confined to the more limited discovery authorized under Indian law. We recognize that under some circumstances, such as when a moving defendant unconditionally consents thereto or no undiscovered evidence of consequence is believed to be under the control of a plaintiff or co-defendant, it may be appropriate to condition a forum non conveniens dismissal on the moving defendant's submission to discovery under the Federal Rules without requiring reciprocal discovery by it of the plaintiff. See, e.g., Piper Aircraft v. Reyno, supra, 454 U.S. at 257 n. 25, 102 S.Ct. at 267 n. 25 (suggesting that district courts can condition dismissal upon a defendant's agreeing to provide all relevant records); Ali v. Offshore Co., 753 F.2d 1327, 1334 n. 16 (5th Cir.1985) (same); Boskoff v. Transportes Aereos Portugueses, 17 Av. Cas. (CCH) 18,613, at 18,616 (N.D.Ill.1983) (accepting defendant's voluntary commitment to provide discovery in foreign forum according to Federal Rules). Basic justice dictates that both sides be treated equally, with each having equal access to the evidence in the possession or under the control of the other. Application of this fundamental principle in the present case is especially appropriate since the UOI, as the sovereign government of India, is expected to be a party to the Indian litigation, possibly on both sides.
 
 
 44
 For these reasons we direct that the condition with respect to the discovery of UCC under the Federal Rules of Civil Procedure be deleted without prejudice to the right of the parties to have reciprocal discovery of each other on equal terms under the Federal Rules, subject to such approval as may be required of the Indian court in which the case will be pending. If, for instance, Indian authorities will permit mutual discovery pursuant to the Federal Rules, the district court's order, as modified in accordance with this opinion, should not be construed to bar such procedure. In the absence of such a court-sanctioned agreement, however, the parties will be limited by the applicable discovery rules of the Indian court in which the claims will be pending.
 
 
 45
 As so modified the district court's order is affirmed.
 
 
 
 *
 Judge Mansfield prepared this opinion prior to his death on January 7, 1987. Except for minor nonsubstantive, editorial changes, it reflects his work, concurred in by the other members of the panel
 
 
 [1]
 UCC briefed only the dispositive issue of forum non conveniens before the district court and suggested that the other two grounds for its motion need not be considered. Discovery was therefore limited to the issue of forum non conveniens; and the district court based its dismissal solely on that doctrine
 
 
 [2]
 At oral argument UOI's counsel stated that UCC refused UOI's offer to furnish copies of some of the documents to UCC in the United States. The district court, on the other hand, found that following the disaster India's Central Bureau of Investigation seized, among other documents, daily, weekly and monthly records of the Bhopal plant operations. UCC states that of the 78,000 pages of documents seized, some 36,000 are plant operation records, of which 1,700 pages relate to plant maintenance in 1983 and 1984
 
 
 [3]
 The Indian court's temporary restraining order has since been dissolved upon UCC's agreement to maintain sufficient assets to satisfy a judgment rendered against it in India
 
 
 [4]
 Section 5304 provides in pertinent part:
 (b) Other grounds for non-recognition. A foreign country judgment need not be recognized if:
 
 
 [1]
 the foreign court did not have jurisdiction over the subject matter;
 
 
 [2]
 the defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend;
 
 
 [3]
 the judgment was obtained by fraud;
 
 
 [4]
 the cause of action on which the judgment is based is repugnant to the public policy of this state;
 
 
 [5]
 the judgment conflicts with another final and conclusive judgment;
 
 
 [6]
 the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court; or
 
 
 [7]
 in the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action
 
 
 [5]
 New York's article 53 is based upon the Uniform Foreign Money-Judgments Recognition Act, see 13 U.L.A. 263 (1962), which has been adopted by 15 states in addition to New York. In states that have not adopted the Uniform Foreign Money-Judgments Recognition Act, foreign judgments may be recognized according to principles of comity. See Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895)
 UCC, as a New York business corporation, would be subject to personal jurisdiction in a court sitting in New York. An Indian money judgment could be enforced against UCC in New York by means of either an action on the judgment or a motion for summary judgment in lieu of complaint. See 7B N.Y.Civ.Prac.L. & R. Sec. 5303. In either case, once converted into a New York judgment, the judgment would be enforceable as a New York judgment, and thus entitled to the full faith and credit of New York's sister states.