**Ken WIWA, individually and as Administrator of the Estate of his deceased father, Ken Saro–Wiwa, Owens Wiwa, and Blessing Kpuinen, individually and as Administratrix of the Estate of her husband, John Kpuinen, and Jane Doe, Plaintiffs–Appellants–Cross–Appellees,**

v.

**ROYAL DUTCH PETROLEUM COMPANY, and Shell Transport and Trading Company, P.L.C., Defendants–Appellees–Cross–Appellants.**

**Docket Nos. 99–7223, 99–7245.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 22, 1999

Decided: Sept. 14, 2000

Judith Brown Chomsky, Elkins Park, PA (Jennifer M. Green, Beth Stephens, and Richard Herz, Center for Constitutional Rights, New York, N.Y. on the brief) for Plaintiffs–Appellants–Cross–Appellees.

Rory O. Millson, Cravath, Swaine & Moore, New York, N.Y. (Sandra C. Goldstein on the brief) for Defendants–Appellees–Cross–Appellants.

Before: OAKES, LEVAL and POOLER, Circuit Judges.

LEVAL, Judge:

This case concerns the application of *forum non conveniens* doctrine to suits under the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350, involving claimed abuses of the international law of human rights. Plaintiffs are three Nigerian émigrés, and a woman identified only as Jane Doe to protect her safety, who allege that they (or in some cases their deceased next of kin) suffered grave human rights abuses at the hands of the Nigerian authorities. Defen-

dants Royal Dutch Petroleum Company ("Royal Dutch") and Shell Transport and Trading Co., P.L.C. ("Shell Transport") are business corporations, incorporated in the Netherlands and the United Kingdom respectively, that are alleged to have directly or indirectly participated in or directed these abuses. The district court (Wood, *J.*) dismissed the action for *forum non conveniens* after determining that England is an adequate alternative forum and that a balancing of public interest and private interest factors make the British forum preferable. Plaintiffs appeal, arguing, inter alia, that the district court erred in not affording sufficient weight to the plaintiffs' choice of forum and to the interests of the United States in providing a forum for the adjudication of claims of abuse of international human rights. Defendants contend that, regardless of the propriety of a dismissal based on *forum non conveniens*, the court lacked personal jurisdiction over them. We hold that the district court properly exercised jurisdiction over the defendants. As to the dismissal for *forum non conveniens*, we reverse.

## BACKGROUND

### A. *Allegations of the Complaint*

Defendant Royal Dutch is a holding company incorporated and headquartered in the Netherlands. Defendant Shell Transport is a holding company incorporated and headquartered in England. The two defendants jointly control and operate the Royal Dutch/Shell Group, a vast, international, vertically integrated network of affiliated but formally independent oil and gas companies. Among these affiliated companies is Shell Petroleum Development Company of Nigeria, Ltd. ("Shell Nigeria"), a wholly-owned Nigerian subsidiary of the defendants that engages in extensive oil exploration and development activity in the Ogoni region of Nigeria.

The amended complaint ("the complaint") alleges that plaintiffs and their next of kin (hereafter collectively referred to as "Plaintiffs") were imprisoned, tortured, and killed by the Nigerian government in violation of the law of nations at the instigation of the defendants, in reprisal for their political opposition to the defendants' oil exploration activities. According to the complaint, Shell Nigeria coercively appropriated land for oil development without adequate compensation, and caused substantial pollution of the air and water in the homeland of the Ogoni people. A protest movement arose among the Ogoni. Ken Saro–Wiwa was an opposition leader and President of the Movement for the Survival of the Ogoni People (MSOP); John Kpuinen was a leader of the MSOP's youth wing.

Allegedly, Shell Nigeria recruited the Nigerian police and military to attack local villages and suppress the organized opposition to its development activity. Saro–Wiwa and Kpuinen were repeatedly arrested, detained and tortured by the Nigerian government because of their leadership roles in the protest movement. In 1995, Saro–Wiwa and Kpuinen were hanged, along with other Ogoni leaders, after being convicted of murder by a special military tribunal. Allegedly, they were convicted on fabricated evidence solely to silence political criticism and were not afforded the legal protections required by international law. The complaint further alleges that plaintiff Owens Wiwa (Saro–Wiwa's brother) was illegally detained by Nigerian authorities, that plaintiff Jane Doe was beaten and shot by the Nigerian military in a raid upon her village, and that Saro–Wiwa's family-including Ken Saro–Wiwa's 74–year–old mother-were beaten by Nigerian officials while attending his trial.

According to the complaint, while these abuses were carried out by the Nigerian government and military, they were instigated, orchestrated, planned, and facilitated by Shell Nigeria under the direction of the defendants. The Royal Dutch/Shell Group allegedly provided money, weap-

ons, and logistical support to the Nigerian military, including the vehicles and ammunition used in the raids on the villages, procured at least some of these attacks, participated in the fabrication of murder charges against Saro–Wiwa and Kpuinen, and bribed witnesses to give false testimony against them.[1]

## B. Facts Relating to Jurisdiction in New York

### 1. Defendants' New York Stock Exchange Listings and Sundry Activities

Neither of the defendants has extensive direct contacts with New York. Both companies list their shares, either directly or indirectly,[2] on the New York Stock Exchange. They conduct activities in New York incident to this listing, including the preparation of filings for the Securities and Exchange Commission (SEC) and the employment of transfer agents and depositories for their shares. Royal Dutch also maintains an Internet site, accessible in New York. They have participated in at least one lawsuit in New York as defendants, without contesting jurisdiction. They have for many years retained New York counsel.

Defendants own subsidiary companies that do business in the United States, including Shell Petroleum Inc. (SPI), a Delaware corporation. SPI in turn owns all the shares of Shell Oil Company (Shell Oil), the well-known oil and gas concern. Shell Oil has extensive operations in New York and is undisputedly subject to the jurisdiction of the New York courts.

### 2. Defendants' Maintenance of an Investor Relations Office in New York City

The defendants also maintain an Investor Relations Office in New York City,

administered by James Grapsi, whose title is "Manager of Investor Relations." The office is nominally a part of Shell Oil. However, all of its functions involve facilitating the relations of the parent holding companies, the defendants Royal Dutch and Shell Transport, with the investment community. The expenses of the office (consisting primarily of rent and salaries) are directly paid in the first instance by Shell Oil, but Shell Oil is reimbursed by the defendants, who therefore bear the full expense of the office. Those expenses average about $45,000 per month, or about $500,000 per year. The Investor Relations Office's duties involve fielding inquiries from investors and potential investors in Royal Dutch and Shell Transport, mailing information about the defendants to thousands of individuals and entities throughout the United States, and organizing meetings between officials of the defendants and investors, potential investors, and financial analysts. Each year the Investor Relations Office organizes about six such sessions and schedules them for various financial centers throughout the United States, including New York. Grapsi manages these functions out of a New York City office located in the Southern District of New York, and characteristically seeks the defendants' approval before scheduling meetings and making other similar decisions.

## C. Proceedings Below

Plaintiffs filed this action on November 8, 1996 and filed an amended complaint on April 29, 1997. The amended complaint seeks damages under the ATCA, the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, international law and trea-

---

1. For purposes of this opinion relating to jurisdiction and forum *non conveniens,* we assume the truth of the allegations (while implying no views on the truth or falsity of the allegations).

2. Shares of Royal Dutch are traded directly on the New York Stock Exchange. Shell Transport's shares are traded indirectly in the United States; investors may purchase American Depository Receipts (ADR's) for shares of Shell, rather than shares themselves.

ties, Nigerian law, and various state law torts. More specifically, the complaint alleges that the defendants are liable for summary execution; crimes against humanity; torture; cruel, inhuman, and degrading treatment; arbitrary arrest and detention; violations of the rights to life, liberty, security of the person, and peaceful assembly and association; wrongful death; assault and battery; intentional and negligent infliction of emotional distress; and conspiracy. It is not entirely clear whether the liability of the defendants is predicated on their own actions, on a theory of responsibility for the actions of their subsidiary Shell Nigeria, or on a combination of both.

At the time of the filing, two of the four plaintiffs (Blessing Kpuinen and Owens Wiwa) lived in the United States, though not in New York.[3]

The defendants moved to dismiss for lack of personal jurisdiction, *forum non conveniens,* and failure to state a claim. In a Report and Recommendation dated March 31, 1998, Magistrate Judge Henry Pitman recommended that Judge Wood dismiss the case for lack of jurisdiction or, alternatively, for *forum non conveniens.* Explicitly reserving the "difficult" questions of substantive law raised by the defendants' 12(b)(6) motion, Magistrate Judge Pitman found that neither the maintenance of the Investor Relations Office nor the defendants' direct actions in New York, were sufficient to constitute "doing business" in New York, as required to establish general jurisdiction under N.Y. C.P.L.R. § 301. Turning to the *forum non conveniens* issue, he determined that England was an "adequate alternative forum" and that the various factors a court is required to balance in evaluating such a motion favor adjudication of the dispute in England.

Upon plaintiffs' objections to the Magistrate Judge's Report, Judge Wood, by order dated September 25, 1998, found that

jurisdiction over the defendants was established under § 301 by virtue of their maintenance of the Investor Relations Office in New York, but accepted the Magistrate Judge's recommendation to dismiss for *forum non conveniens.*

Plaintiffs moved for reconsideration in light of this court's decision in *Jota v. Texaco, Inc.,* 157 F.3d 153 (2d Cir.1998). By order dated January 20, 1999, Judge Wood granted their motion, to the extent of conditioning dismissal on the defendants' commitment to consent to service of process in England, comply with all discovery orders, pay any judgment rendered in England, waive a security bond, and waive a statute of limitations defense if an action is begun in England within one year of the conclusion of these proceedings, which conditions defendants accepted. Otherwise the motion was denied.

## DISCUSSION

### A. Personal Jurisdiction

Under the Federal Rules of Civil Procedure, a court may exercise jurisdiction over any defendant "who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located," Fed.R.Civ.P. 4(k)(1)(a), provided of course that such an exercise of jurisdiction comports with the Fifth Amendment's Due Process Clause. The question is therefore whether the defendants may be subjected to the jurisdiction of the courts of the State of New York.

Before the court below, plaintiffs offered multiple theories as to why New York could properly exercise personal jurisdiction over the defendants. While the Magistrate Judge rejected all of these theories, the district court held that, under prevailing law, the activities of the Investor Relations Office on the defendants' behalf in New York were both attributable to the defendants and sufficient to confer jurisdiction. On appeal, defendants make

---

**3.** Owens Wiwa has since moved to Canada.

four arguments: (1) these activities are not attributable to the defendants for jurisdictional purposes; (2) these New York activities cannot be considered in the jurisdictional calculus because they are merely "incidental" to a stock market listing and are jurisdictionally inconsequential as a matter of law; (3) the Investor Relations activities are legally insufficient to confer general jurisdiction; and (4) exercising jurisdiction over the defendants would violate the fairness requirement of the Due Process Clause. For the reasons discussed below, we reject each of these contentions and hold that the defendants are subject to personal jurisdiction in the Southern District of New York.[4]

### (1) The Agency Analysis.

 Under New York law, a foreign corporation is subject to general personal jurisdiction in New York if it is "doing business" in the state. *See* N.Y. C.P.L.R. § 301 (codifying caselaw that incorporates "doing business" standard); *see also Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985). "[A] corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Id.* (quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915 (1917)). In order to establish that this standard is met, a plaintiff must show that a defendant engaged in "continuous, permanent, and substantial activity in New York." *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir.1990).

 The continuous presence and substantial activities that satisfy the requirement of doing business do not neces-

sarily need to be conducted by the foreign corporation itself. In certain circumstances, jurisdiction has been predicated upon activities performed in New York for a foreign corporation by an agent. Under well-established New York law, a court of New York may assert jurisdiction over a foreign corporation when it affiliates itself with a New York representative entity and that New York representative renders services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available. *See, e.g., Frummer v. Hilton Hotels Int'l Inc.*, 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967) (finding jurisdiction over foreign hotel chain based on the activities of affiliated reservations service); *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 120–21 (2d Cir.1967) (applying *Frummer* to find jurisdiction over tour operator based on the activities of affiliated travel agent). To come within the rule, a plaintiff need demonstrate neither a formal agency agreement, *see, e.g., New York Marine Managers, Inc. v. M.V. "Topor–1"*, 716 F.Supp. 783, 785 (S.D.N.Y.1989), nor that the defendant exercised direct control over its putative agent, *see, e.g., Palmieri v. Estefan*, 793 F.Supp. 1182, 1194 (S.D.N.Y.1992). The agent must be primarily employed by the defendant and not engaged in similar services for other clients. *See, e.g., Miller v. Surf Properties, Inc.*, 4 N.Y.2d 475, 481, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958) (holding that independent contractors with many clients are not considered agents of their individual clients for jurisdictional purposes).

 Both Magistrate Judge Pitman and Judge Wood found that Grapsi and the Investor Relations Office were agents of the defendants for jurisdictional purposes. We agree. While nominally a part of Shell

---

**4.** Because we hold that jurisdiction is properly exercised over the defendants on the basis of the activities of the Investor Relations Office, we do not reach any of the other jurisdic-

tional issues raised by the plaintiffs. We express no views on the merits of any of their alternative arguments.

Oil, Grapsi and the Investor Relations Office devoted one hundred percent of their time to the defendants' business. Their sole business function was to perform investor relations services on the defendants' behalf. The defendants fully funded the expenses of the Investor Relations Office (including salary, rent, electricity, mailing costs, etc.), and Grapsi sought the defendants' approval on important decisions.

The defendants nonetheless argue that the relationship does not meet the *Frummer/Gelfand* test. They contend the services of the Investor Relations Office were not sufficiently important that the defendants would have performed them if an agent had been unavailable. We do not find this argument persuasive. While it is true that the Investor Relations Office was not directly involved with the core functions of the defendant's business-the operation of an integrated international oil business, its work was of meaningful importance to the defendants. The defendants are huge publicly-traded companies with a need for access to capital markets. The importance of their need to maintain good relationships with existing investors and potential investors is illustrated by the fact that they pay over half a million dollars per year to maintain the Investors Relations office. In our view, the amount invested by the defendants in the U.S. investor relations activity substantially establishes the importance of that activity to the defendants.

Defendants also contend that, if they were to perform the Investor Relations services themselves, it would not necessarily be in New York. The argument is extremely weak. While of course it is true, especially given technological advances in communication, that such an office *could* conceivably be located anywhere in the world, the strongest indications are that the defendants selected New York as the locus of the present office because that is the most logical place for it. Insofar as the office concerns itself with investors in the U.S. capital markets, it makes better sense to have the office in the United States, rather than in another country. New York is widely regarded as the capital of U.S. capital markets. It seems most likely that the Investor Relations Office established by Shell Oil for the benefit of its parents and at their insistence was established in New York City because that was the best place for such an office, and that it would most likely be located in New York City regardless whether operated directly by the defendants, by Shell Oil, or by any other agent.[5] *Cf. Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (describing as "essential" element in jurisdictional inquiry the question whether "there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws"); *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (same); *LiButti v. United States,* 178 F.3d 114, 122 (2d Cir.1999) (same).

The defendants' argument is also difficult to square with the facts of the seminal agency jurisdiction cases, *Frummer* and *Gelfand.* In those cases, the foreign corporations were not absolutely required to choose New York as the locus of their reservations services. *See generally Frummer,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (involving booking agent that took reservations and performed public relations services for a foreign hotel chain); *Gelfand,* 385 F.2d 116 (involving sales representative that took reservations and performed other services for out-of-state tour operator). They could have located those operations elsewhere, either foregoing the New York market entirely or arranging to service New York customers more circuitously. However, in both

those cases the defendants chose to locate offices in Manhattan to establish easy access to New York's rich market of potential customers, see *Gelfand,* 385 F.2d at 121, thereby better serving their own interests. The circumstances of the present case support the inference that the defendants made a similar calculation when they chose to locate their Investor Relations Office in New York.

## (2) *The Nature of the Activities of the Investor Relations Office.*

The defendants contend their Investor Relations Office is an activity that is "incidental" to their listing on the New York Stock Exchange. They cite to a long stream of caselaw reaching back over a century that they argue precludes courts from considering activity "incidental" to stock market listings when evaluating whether a corporation is doing business in the state of New York. We agree that the prevailing caselaw accords foreign corporations substantial latitude to list their securities on New York-based stock exchanges and to take the steps necessary to facilitate those listings (such as making SEC filings and designating a depository for their shares) without thereby subjecting themselves to New York jurisdiction for unrelated occurrences. *See, e.g., Celi v. Canadian Occidental Petroleum Ltd.,* 804 F.Supp. 465, 468 (E.D.N.Y.1992); *Fowble v. Chesapeake & Ohio Ry. Co.,* 16 F.2d 504, 505 (S.D.N.Y.1926); *Clews v. Woodstock Iron Co.,* 44 F. 31, 32 (S.D.N.Y.1890); *Freeman v. Bean,* 266 N.Y. 657, 657–58, 195 N.E. 368 (1935). However, defendants misread the scope of the existing caselaw when they argue that all contacts related to stock exchange listings are stripped of jurisdictional significance.

■ To begin with, it is not that activities necessary to maintain a stock exchange listing do not count, but rather that, without more, they are insufficient to confer jurisdiction. *See, e.g., Pomeroy v. Hocking Valley Ry. Co.,* 218 N.Y. 530, 536, 113 N.E. 504 (1916) ("The payment, too, of dividends and the transfer of stock while perhaps not sufficient of themselves to constitute the transaction of business . . ., doubtless are of some importance in connection with other facts."); *Fowble,* 16 F.2d at 505 (such contacts are "of some importance in determining whether the corporation [i]s doing business in the state, although such facts may not be sufficient in itself to constitute such doing of business"). Other cases in this line imply a similar result when they suggest that jurisdiction is not available over a corporation whose *only* contacts with the forum are listings on the New York stock exchanges and ancillary arrangements involving the distribution of their shares. *See, e.g., Grossman v. Sapphire Petroleums Ltd.,* 195 N.Y.S.2d 851, 852–53 (N.Y.Sup.1959).

■ The Investor Relations Office conducts a broader range of activities on the defendants' behalf than those described in the cited cases as merely "incidental" to the stock exchange listing. These activities, which range from fielding inquiries from investors and potential investors to organizing meetings between defendants' officials and investors, potential investors, and financial analysts, do not properly come within the rule upon which the defendants rely. The defendants' Investor Relations program results not from legal or logistical requirements incumbent upon corporations that list their shares on the New York Stock Exchange, but from the defendants' discretionary determination to invest substantial sums of money in cultivating their relationship with the New York capital markets. It appears the location of the office in New York City has far more to do with the importance of New York as a center of capital markets than with the proximity of the New York Stock Exchange. A company can perfectly well maintain a listing on the New York (or any other) Stock Exchange without maintaining an office nearby to cultivate relations with investors.

In summary, the large body of caselaw the defendants point to at most stands for

the proposition that, absent other substantial contacts, a company is not "doing business" in New York merely by taking ancillary steps in support of its listing on a New York exchange. The activities chargeable to the defendants go well beyond this minimum. We conclude that the activities of the Investor Relations Office go beyond the range of activities that have been held insufficient to subject foreign corporations to the jurisdiction of New York courts.

### (3) *The Sufficiency of Contacts*

■ The defendants further contend that the activities of the Investor Relations Office are quantitatively insufficient to confer jurisdiction. *See Landoil,* 918 F.2d at 1043 (requiring "continuous, permanent and substantial activity") (quoting Weinstein, Korn & Miller, *New York Civil Practice,* ¶ 301.16, at 3–32). We find no merit to this contention. Where, as here, plaintiffs' claim is not related to defendants' contacts with New York, so that jurisdiction is properly characterized as "general," plaintiffs must demonstrate "the defendant's 'continuous and systematic general business contacts.'" *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 568 (2d Cir.1996) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Defendants' contacts constitute "a continuous and systematic general business" presence in New York and therefore satisfy the minimum contacts portion of a due process analysis.

■ Citing to a string of cases holding that solicitation of business plus minimal additional contacts satisfies Section 301, Judge Wood characterized the activities of the Investor Relations Office as satisfying the test of "solicitation plus." The defendants dispute this characterization, arguing that Grapsi did not perform "solicitation" because he did not offer to buy or sell any stock in the corporation. As Judge Wood noted, however, a finding of "solicitation" in the jurisdictional context

does not necessarily require "solicitation" in the sense of an offer of contract. Rather, the central question is whether the defendant (or its agent) behaved in such a way so as to encourage others to spend money (or otherwise act) in a manner that would benefit the defendant. *Cf., e.g., Landoil,* 918 F.2d at 1044 (trips to New York to service existing accounts constitutes "solicitation"). Judge Wood's characterization of the Investor Relations Office's activities as "solicitation" appears to be a sound interpolation of pre-existing precedent into a new factual context.

■ However, we need not rely upon such a characterization to support general jurisdiction in this case, because even without relying on the "solicitation plus" formulation, the activities of the Investor Relations Office meet the "doing business" standard. In assessing whether jurisdiction lies against a foreign corporation, both this court and the New York courts have focused on a traditional set of indicia: for example, whether the company has an office in the state, whether it has any bank accounts or other property in the state, whether it has a phone listing in the state, whether it does public relations work there, and whether it has individuals permanently located in the state to promote its interests. *See, e.g., Hoffritz for Cutlery,* 763 F.2d at 58; *Frummer,* 19 N.Y.2d at 537, 281 N.Y.S.2d 41, 227 N.E.2d 851. The Investor Relations Office, whose activities are attributable to the defendants under the *Frummer* analysis, meets each of these tests. It constitutes a substantial "physical corporate presence" in the State, permanently dedicated to promoting the defendants' interests. *Artemide SpA v. Grandlite Design & Mfg. Co.,* 672 F.Supp. 698, 703 (S.D.N.Y.1987); *see also, e.g., Lane v. Vacation Charters, Ltd.,* 750 F.Supp. 120, 125 (S.D.N.Y.1990) ("Perhaps the most important factor needed for a finding of jurisdiction under CPLR § 301 is the in-state presence of employees engaged in business activity."); *cf. Landoil,* 918 F.2d at 1045 n. 10 (noting that while

periodic business trips to New York to solicit business did not confer jurisdiction, "renting a hotel room ... on a systematic and regular basis might be the functional equivalent of an office in New York and therefore might be sufficient to establish presence within the state"). We agree with Judge Wood that the continuous presence of the Investor Relations program in New York City is sufficient to confer jurisdiction.

### (4) Fairness

Finally, the defendants argue that it would violate the fairness requirement of the Due Process Clause for a New York court to exercise jurisdiction over them. Again, we disagree.

Personal jurisdiction may be exercised only when (1) the State's laws authorize service of process upon the defendant and (2) an assertion of jurisdiction under the circumstances of the case comports with the requirements of due process. *See, e.g., Kernan v. Kurz–Hastings, Inc.,* 175 F.3d 236, 240 (2d Cir.1999). The required due process inquiry itself has two parts: whether a defendant has "minimum contacts" with the forum state and whether the assertion of jurisdiction comports with "traditional notions of fair play and substantial justice-that is whether ... [the exercise of jurisdiction] is reasonable under the circumstances of a particular case." *Chaiken v. VV Publ'g Corp.,* 119 F.3d 1018, 1027 (2d Cir.1997) (internal quotations omitted).

As noted above, the defendants' contacts go well beyond the minimal. As a general rule, in making the constitutional analysis once a plaintiff has made a "threshold showing" of minimum contacts, the defendant must come forward with a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Robertson–Ceco Corp.,* 84 F.3d at 568 (internal quotations omitted). The defendants have not made any such compelling showing here.

While it is true that certain factors normally used to assess the reasonableness of subjection to jurisdiction do favor the defendants (they are foreign corporations that face something of a burden if they litigate here, and the events in question did not occur in New York), litigation in New York City would not represent any great inconvenience to the defendants. The defendants control a vast, wealthy, and far-flung business empire which operates in most parts of the globe. They have a physical presence in the forum state, have access to enormous resources, face little or no language barrier, have litigated in this country on previous occasions, have a four-decade long relationship with one of the nation's leading law firms, and are the parent companies of one of America's largest corporations, which has a very significant presence in New York. New York City, furthermore, where the trial would be held, is a major world capital which offers central location, easy access, and extensive facilities of all kinds. We conclude that the inconvenience to the defendants involved in litigating in New York City would not be great and that nothing in the Due Process Clause precludes New York from exercising jurisdiction over the defendants.

### B. Forum Non Conveniens

Plaintiffs appeal from the decision of the district court to dismiss for *forum non conveniens.* The grant or denial of a motion to dismiss for *forum non conveniens* is generally committed to the district court's discretion. *See, e.g., Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996). The deference accorded to a district court's discretion, however, presupposes that the court used the correct standards prescribed by the governing rule of law. *See Guidi v. Inter–Continental Hotels Corp.,* 224 F.3d 142, 144–45 (2d Cir.2000) (quoting *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991)). We believe that, as a matter of law, in balancing the competing interests,

the district court did not accord proper significance to a choice of forum by lawful U.S. resident plaintiffs or to the policy interest implicit in our federal statutory law in providing a forum for adjudication of claims of violations of the law of nations.

 In 1947, the Supreme Court handed down a pair of decisions laying out the framework for *forum non conveniens* analysis that the federal courts follow to this day. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Koster v. American Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). Under these cases, *forum non conveniens* is a discretionary device permitting a court in rare instances to "dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim." *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 73 (2d Cir.1998); *see also Gilbert,* 330 U.S. at 507, 67 S.Ct. 839. In assessing whether *forum non conveniens* dismissal is appropriate, courts engage in a two-step process: The first step is to determine if an adequate alternative forum exists. *See, e.g., Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Gilbert,* 330 U.S. at 506–07, 67 S.Ct. 839. If so, courts must then balance a series of factors involving the private interests of the parties in maintaining the litigation in the competing fora and any public interests at stake. *See, e.g., id.* at 508–09, 67 S.Ct. 839. The defendant has the burden to establish that an adequate

alternative forum exists and then to show that the pertinent factors "tilt[ ] strongly in favor of trial in the foreign forum." *R. Maganlal & Co.,* 942 F.2d at 167. "[T]he plaintiff's choice of forum should rarely be disturbed." *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839.

On appeal, plaintiffs challenge both prongs of the district court's finding. As to the first prong, they dispute the adequacy of a British forum, because three doctrines of English law—double actionability, transmissibility, and the act of state doctrine—would potentially bar a British court from reaching the subject matter of this dispute. As the parties' experts describe the British law, the doctrine of double accountability states that, with limited exceptions, torts committed in other countries are actionable in England only if they would be actionable under both English law and the law of the country in which the act was committed.[6] The doctrine of transmissibility holds that the question whether a decedent's claims transfer to his survivors is determined by the law of the decedent's nation.[7] The act of state doctrine bars, on comity grounds, the consideration of certain claims arising out of the official actions of foreign governments.[8]

At oral argument in this court, the defendants undertook not to invoke either double actionability or transmissibility to block the plaintiffs' claims in a British court. The defendant made no such undertaking concerning the act of state doctrine. It is not clear in any event what

6. On the doctrine of double actionability, the parties refer primarily to *Phillips v. Eyre,* 1870 L.R. 6 Q.B. 1, and Dicey & Morris, *Conflict of Laws* 1480 *et seq.* (12th ed.1993).

7. On transmissibility, the parties refer to Dicey & Morris, *supra* note 6, at 1521.

8. The parties cite to numerous sources discussing the contours of the act of state doctrine. *See, e.g., Luthor v. Sagor* 1921 3 K.B. 532, 548; *Buttes Gas and Oil Co. v. Hammer (Nos. 2 & 3),* 1981 3 All ER 616; Dicey & Morris, *supra* note 6, at 108–11, 996–97; Dame Rosalyn Higgins, *Problems & Process*

212 (1994). Subsequent to the briefing in this case, the House of Lords decided the twin appeals arising out of the arrest of Chilean Senator and former General Augusto Pinochet. The parties submitted a copy of that decision and letter briefs debating its meaning. *See generally Regina v. Bartle and the Commissioner of Police for the Metropolis and Others Ex Parte Pinochet* and *Regina v. Evans and Another and the Commissioner of Police for the Metropolis and Others Ex Parte Pinochet* (House of Lords Mar. 24, 1999) (appeals from divisional courts of the Queen's Bench Division).

significance to accord to such undertakings. As the policies underlying the act of state doctrine are grounded not in the rights of the parties but in comity among nations, a court may well follow the doctrine regardless whether it was advanced by the party to be benefitted. Also, as to double actionability and transmissibility, the British courts might well follow British law to determine whether an action lies and whether the plaintiff has standing to bring it, regardless whether the defendant raised an argument based on these doctrines.

As to the act of state doctrine, the parties vigorously dispute whether the doctrine has broader contours in the British courts than in the United States. The defendants argue, furthermore, that availability of an adequate alternative forum focuses on the quality of the forum and its commitment to the rule of law and not on differences in substantive or procedural law between the competing fora that might influence the outcome of the trial. *See Piper*, 454 U.S. at 254 & n. 22, 102 S.Ct. 252 (noting that rules of law less favorable to the plaintiff rarely affect the threshold inquiry into whether alternative forum is "adequate"); *PT United Can*, 138 F.3d at 74 (foreign forum still "adequate" alternative forum for RICO action despite absence of similar conspiracy statute).

We need not resolve these issues. We regard the British courts as exemplary in their fairness and commitment to the rule of law. Furthermore, we assume *arguendo* that there are no rules of British law that would prevent a British court from reaching the merits. We believe the order of dismissal must nonetheless be reversed as the defendants have not established as *Gilbert* requires that the pertinent factors tilt sufficiently strongly in favor of trial in the foreign forum.

In our view, the district court failed to give weight to three significant considerations that favor retaining jurisdiction for trial: (1) a United States resident plaintiff's choice of forum, (2) the interests of the United States in furnishing a forum to litigate claims of violations of the international standards of the law of human rights, and (3) the factors that led the district court to dismiss in favor of a British forum were not particularly compelling. For the reasons developed below, we believe that they are outweighed by the considerations favoring exercise of the court's jurisdiction.

(1) *Deference to the Choice of a United States Forum by a Lawful United States Resident Plaintiff*

■ By definition, the doctrine of *forum non conveniens* contemplates the dismissal of lawsuits brought by plaintiffs in their favored forum in favor of adjudication in a foreign court. Nonetheless, a plaintiff's choice of forum is entitled to substantial deference and should only be disturbed if the factors favoring the alternative forum are compelling. *See, e.g., Gilbert*, 330 U.S at 508, 67 S.Ct. 839 ("[A] plaintiff's choice of forum should rarely be disturbed."); *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir.1993) ("[T]here is … a strong presumption in favor of a plaintiff's choice of forum."); *R. Maganlal & Co.*, 942 F.2d at 167 (as plaintiff's choice of forum is entitled to deference, *forum non conveniens* dismissal is only permissible where the relevant considerations "tilt[ ] strongly in favor of trial in the foreign forum"); *cf. Bell v. Hood*, 327 U.S. 678, 681, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (plaintiff is "master" of his or her own lawsuit).

■ While any plaintiff's selection of a forum is entitled to deference, that deference increases as the plaintiff's ties to the forum increase. *See, e.g., Murray v. British Broad. Corp.*, 81 F.3d 287, 290 (2d Cir.1996) (holding that a domestic plaintiff's choice of forum is entitled to more deference than a foreign plaintiff's); *see also Piper*, 454 U.S. at 255 n. 23, 102 S.Ct. 252 (noting that the choice of a forum by its citizens and residents is entitled to greater deference than a stranger's

choice); *Koster*, 330 U.S. at 524, 67 S.Ct. 828 ("[A] real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown."). In a decision handed down since oral argument in this case, we overturned a *forum non conveniens* dismissal in a case brought by a United States citizen involving events occurring outside the United States where the defendant was unable to " 'establish such oppressiveness and vexation . . . as to be out of all proportion to plaintiff's convenience' " and where there were no compelling public interest considerations favoring litigation in the alterative foreign forum. *Guidi*, 224 F.3d at 145–46 (quoting *Koster*, 330 U.S. at 524, 67 S.Ct. 828).

■ These cases do not reflect a rigid rule of decision protecting U.S. citizen or resident plaintiffs from dismissal for *forum non conveniens*. Rather, they illustrate the manner in which a court must take into account the hardship dismissal would cause to a resident plaintiff when evaluating the *Gilbert* factors; in the words of this court the cited cases represent a "consistent, pragmatic application" of the *Gilbert* factors to actions in which a plaintiff has particular ties to the forum state. *Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 152 (2d Cir.1980) (in banc). The *Gilbert* test requires a balancing of factors, and a plaintiff's lawful U.S. residence can be a meaningful factor supporting the plaintiff's choice of a U.S. forum. *Cf. Alcoa*, 654 F.2d at 155 (*forum non conveniens* should not be conditioned solely upon residence, but " 'residence is, of course, an important factor to be considered' ") (quoting *Silver v. Great American Insurance Co.*, 29 N.Y.2d 356, 361, 328 N.Y.S.2d 398, 278 N.E.2d 619 (1972)).

That is the case not because of chauvinism or bias in favor of U.S. residents. It is rather because the greater the plaintiff's ties to the plaintiff's chosen forum, the more likely it is that the plaintiff would be inconvenienced by a requirement to bring the claim in a foreign jurisdiction. Also, while our courts are of course required to offer equal justice to all litigants, *see id.*, 654 F.2d at 152–53 (noting existence of treaties requiring "no less favorable" treatment of foreign nationals), a neutral rule that compares the convenience of the parties should properly consider each party's residence as a factor that bears on the inconvenience that party might suffer if required to sue in a foreign nation.

During the last two decades, our caselaw and that of the Supreme Court has clearly and unambiguously established that courts should offer greater deference to the selection of a U.S. forum by U.S. resident plaintiffs when evaluating a motion to dismiss for *forum non conveniens*. *See, e.g., Murray*, 81 F.3d at 290; *Piper*, 454 U.S. at 255 n. 23, 102 S.Ct. 252. Our earlier in-banc decision in *Alcoa*, 654 F.2d 147, is not to the contrary. In that case, we rejected the proposition that courts must accord "a talismanic significance to the citizenship or residence of the parties," *id.* at 154, and held that "citizenship [and] residence no longer are absolutely determinative factors," *id.* at 157, in the *forum non conveniens* analysis. *Alcoa* requires that we apply the *Gilbert* factors in evaluating a *forum non conveniens* motion, even when the plaintiff is a U.S. citizen or resident; *Murray* and *Piper* point to the important role the plaintiff's residence and citizenship potentially play in the *Gilbert* analysis; and *Guidi* illustrates that a plaintiff's U.S. citizenship and residence is entitled to consideration in favor of retaining jurisdiction, such that the *Gilbert* factors will favor dismissal (in the absence of strong public interest factors favoring dismissal) only if the defendant can establish " 'such oppressiveness and vexation . . . as to be out of all proportion to plaintiff's convenience.' " *Guidi*, 224 F.3d at 146 (quoting *Koster*, 330 U.S. at 524, 67 S.Ct. 828).[9]

---

9. We read *Guidi* as allowing for the possibility that, under certain circumstances, the public interest factors favoring dismissal might (by themselves or in combination with incon-

■ In this case, the district court weighed against the plaintiffs that none of them were residents of the Southern District of New York but did not count in favor of their choice of a U.S. forum that two of them were residents of the United States. This was error. *See, e.g., Piper,* 454 U.S. at 255 n. 23, 102 S.Ct. 252; *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India,* 809 F.2d 195, 198 (2d Cir.1987). The benefit for a U.S. resident plaintiff of suing in a U.S. forum is not limited to suits in the very district where the plaintiff resides, especially considering that the defendant may not be amenable to suit in the plaintiff's district of residence. *See, e.g., Guidi,* 224 F.3d at 146–47 (the "home forum" of an American citizen for *forum non conveniens* purposes is any "United States court"); *see also Piper,* 454 U.S. at 255 n. 23, 102 S.Ct. 252 (distinguishing between "foreign" and "American" plaintiffs in explaining why greater deference is due to the forum choice of "citizens" and "residents"); *cf. Swift & Co. Packers v. Compania Colombiana Del Caribe,* 339 U.S. 684, 697, 70 S.Ct. 861, 94 L.Ed. 1206 (1950) ("[A] suit by a United States citizen against a foreign respondent brings into force considerations very different from those in suits between foreigners."). In deciding whether to dismiss a case brought by a lawful U.S. resident plaintiff for *forum non conveniens,* the district should consider whether, in view of the plaintiff's U.S. residence, such a dismissal would cause plaintiff significant hardship.

In all of our cases in which we have deemed a plaintiff "foreign" and accorded that plaintiff's choice of forum less deference, the plaintiffs involved were foreign corporations or foreign-national individuals residing abroad. *See, e.g., Capital Currency Exch. N.V. v. National Westminster Bank, P.L.C.,* 155 F.3d 603, 611–12 (2d Cir.1998), *cert. denied,* 526 U.S. 1067, 119 S.Ct. 1459, 143 L.Ed.2d 545 (1999) (real parties in interest were English corporations); *PT United Can,* 138 F.3d at 74 (plaintiff was an Indonesian corporation); *In re Union Carbide,* 809 F.2d at 198 (plaintiffs were Indian citizens and residents). We have never accorded less deference to a foreign plaintiff's choice of a United States forum where that plaintiff was a U.S. resident.

In short, the district court applied an incorrect standard of law when it failed to credit the fact that two of the plaintiffs were United States residents as a consideration favoring plaintiff's choice of a U.S. forum.

(2) *The Application of Forum Non Conveniens Doctrine to ATCA Cases*

■ The plaintiffs also argue that the ATCA, as supplemented by the Torture Victim Prevention Act (TVPA), 28 U.S.C. § 1350 App., in 1991, reflects a United States policy interest in providing a forum for the adjudication of international human rights abuses, and that this policy interest should have a role in the balancing of the *Gilbert* factors.

The Alien Tort Claims Act was adopted in 1789 as part of the original Judiciary Act. In its original form, it made no assertion about legal rights; it simply asserted that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the

---

venience to the defendant not quite rising to the level of "oppressiveness and vexation") be strong enough to justify dismissal, notwithstanding the absence of "oppressiveness and vexation." *See Guidi,* 224 F.3d at 146 (stating the *forum non conveniens* dismissal against a U.S. citizen seeking to invoke a U.S. forum may be appropriate if defendant presents a "clear showing of facts which … make trial in the chosen forum inappropriate be-

cause of considerations affecting the court's own administrative and legal problems" (quoting *Koster,* 330 U.S. at 524, 67 S.Ct. 828)). Furthermore, *Guidi's* focus on the balancing of defendant's inconvenience against plaintiff's implicitly recognizes that, depending on the particular circumstances, the degree of inconvenience that dismissal would impose on a U.S. resident will vary.

United States." 28 U.S.C. § 1350. For almost two centuries, the statute lay relatively dormant, supporting jurisdiction in only a handful of cases. *See, e.g., Filartiga v. Pena–Irala,* 630 F.2d 876, 887 & n. 21 (2d Cir.1980) (identifying only two previous cases that had relied upon the ATCA for jurisdiction). As the result of increasing international concern with human rights issues, however, litigants have recently begun to seek redress more frequently under the ATCA. *See, e.g., Abebe–Jira v. Negewo,* 72 F.3d 844 (11th Cir. 1996) (alleging torture of Ethiopian prisoners); *Kadic v. Karadzic,* 70 F.3d 232 (2d Cir.1995) (alleging torture, rape, and other abuses orchestrated by Serbian military leader); *In re Estate of Ferdinand Marcos,* 25 F.3d 1467 (9th Cir.1994) (alleging torture and other abuses by former President of Phillippines); *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir. 1984) (alleging claims against Libya based on armed attack upon civilian bus in Israel); *Filartiga,* 630 F.2d 876 (alleging torture by Paraguayan officials); *Xuncax v. Gramajo,* 886 F.Supp. 162 (D.Mass.1995) (alleging abuses by Guatemalan military forces).

These suits produced several important decisions interpreting the meaning and scope of the 1789 Act. For example, in

*Filartiga v. Pena–Irala,* 630 F.2d at 880, 884–86, this court held that deliberate torture perpetrated under the color of official authority violates universally accepted norms of international human rights law, and that such a violation of international law constitutes a violation of the domestic law of the United States, giving rise to a claim under the ATCA whenever the perpetrator is properly served within the borders of the United States. More recently, we held in *Kadic v. Karadzic,* 70 F.3d at 239–40, 245, that the ATCA reaches the conduct of private parties provided that their conduct is undertaken under the color of state authority or violates a norm of international law that is recognized as extending to the conduct of private parties.

In passing the Torture Victim Prevention Act, 28 U.S.C. § 1350 App., in 1991, Congress expressly ratified our holding in *Filartiga* that the United States courts have jurisdiction over suits by aliens alleging torture under color of law of a foreign nation, and carried it significantly further. While the 1789 Act expressed itself in terms of a grant of jurisdiction to the district courts,[10] the 1991 Act (a) makes clear that it creates *liability under U.S. law* where under "color of law, of any foreign nation" an individual is subject to

---

**10.** The original purposes of the ATCA remain the subject of some controversy. The Act has no formal legislative history. In the most learned exposition of the statute's original purposes, Judge Edwards suggested that the statute was originally motivated by a desire to insure that claims by an alien against U.S. citizens or for incidents occurring in the United States were litigated in federal court rather than state court, so as to prevent the states from mishandling such cases and creating international incidents. *See Tel–Oren,* 726 F.2d at 782–83 (Edwards, J., concurring). Some scholars have suggested that the Act's original purpose may have been even narrower. For example, one 1995 article suggests that the statute was intended to remedy a single problem: torts committed by the crews of vessels in the course of stopping and boarding ships suspected of aiding the enemy in a time of war. *See* Joseph Modeste Sweeney, *A Tort Only in Violation of the Law of Nations,*

18 Hastings Int'l & Comp. L.Rev. 445 (1995). Whatever the intent of the original legislators (a matter that is forever hidden from our view by the scarcity of relevant evidence), the text of the Act seems to reach claims for international human rights abuses occurring abroad. We reached the conclusion that such claims are properly brought under the Act in *Filartiga,* 630 F.2d at 880; Congress ratified our conclusion by passing the Torture Victim Protection Act, *see* H.R.Rep. No. 102–367, at 4 (1991); *reprinted in* 1992 U.S.C.C.A.N. 84, 86; and we have since reaffirmed our conclusion, *see, e.g., Kadic v. Karadzic,* 74 F.3d 377, 378 (2d Cir.1996) (opinion denying rehearing) (rejecting argument that new scholarly evidence precludes broad interpretation of ATCA). *Filartiga* remains the leading case interpreting the ATCA. As Judge Newman stated four years ago, "[w]e have neither the authority nor the inclination to retreat from that ruling." *Id.*

torture or "extra judicial killing," [11] and (b) extends its remedy not only to aliens but to any "individual," thus covering citizens of the United States as well. 28 U.S.C. § 1350 App. The TVPA thus recognizes explicitly what was perhaps implicit in the Act of 1789—that the law of nations is incorporated into the law of the United States and that a violation of the international law of human rights is (at least with regard to torture) *ipso facto* a violation of U.S. domestic law. *See* H.R.Rep. No. 102–367, at 4 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 86 (noting that purposes of TVPA are to codify *Filartiga*, to alleviate separation of powers concerns, and to expand remedy to include U.S. citizens).

Whatever may have been the case prior to passage of the TVPA, we believe plaintiffs make a strong argument in contending that the present law, in addition to merely permitting U.S. District Courts to entertain suits alleging violation of the law of nations, ·expresses a policy favoring receptivity by our courts to such suits. Two changes of statutory wording seem to indicate such an intention. First is the change from addressing the courts' "jurisdiction" to addressing substantive rights; second is the change from the ATCA's description of the claim as one for "tort ... committed in violation of the law of nations ..." to the new Act's assertion of the substantive right to damages under U.S. law. This evolution of statutory language seems to represent a more direct recognition that the interests of the United States are involved in the eradication of torture committed under color of law in foreign nations.[12]

In *Jota v. Texaco, Inc.*, 157 F.3d 153, 159 (2d Cir.1998), we recognized the plaintiff's argument that "to dismiss ... [a claim pursuant to the ATCA under *forum non conveniens*] would frustrate Congress's intent to provide a federal forum for aliens suing domestic entities for violation of the law of nations." We expressed "no view" on the question but directed the District Court to consider the issue on remand. *Id.* In this case, the issue is again advanced (in slightly different form, as *Jota* did not involve torture and the defendants in this case are not domestic entities).

Dismissal on grounds of *forum non conveniens* can represent a huge setback in a plaintiff's efforts to seek reparations for acts of torture. Although a *forum non conveniens* dismissal by definition presup-

---

**11.** "Extra judicial killing" is defined as "a deliberated killing" not authorized by the judgment of a court "affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1350 App. In this opinion, we use the word "torture" to include both torture and "extra judicial killing," except where the context makes clear the more limited meaning is intended.

**12.** Plaintiffs argue that these statutes also raise a related but distinct U.S. policy interest in insuring that claims arising out of human rights abuses are adjudicated according to the standards of international law. In arguing for this principle, they assume that the law of nations necessarily provides the substantive standards for evaluating claims brought under the ATCA in situations where the underlying claims involve human rights abuses. While they may well be right that such a principle is implicit in the ATCA, the federal courts have never definitively resolved this choice-of-law question. *Compare Xuncax,* 886 F.Supp. at 180–83 (holding that international law provides substantive law for ATCA cases) with *Tel–Oren,* 726 F.2d at 777, 781–82 (Edwards, J., concurring) (suggesting that, while international law triggers jurisdiction under ATCA, tort laws of forum state might provide substantive causes of action), *and In re Estate of Ferdinand Marcos,* 978 F.2d at 503 (9th Cir.1992) (approving district court procedure that based jurisdiction on international law but applied tort law of state where underlying events occurred); *see also Filartiga,* 630 F.2d at 889 (holding that ATCA establishes cause of action for violations of international law but requiring the district court to perform a traditional choice-of-law analysis to determine whether international law, law of forum state, or law of state where events occurred should provide substantive law in such an action). Because our decision regarding the *forum non conveniens* dismissal is based on other grounds, we need not reach this question.

poses the existence of another forum where the suit may be brought, *see Jota,* 157 F.3d at 158–59, dismissal nonetheless requires the plaintiff to start over in the courts of another nation, which will generally at least require the plaintiff to obtain new counsel, as well as perhaps a new residence.

One of the difficulties that confront victims of torture under color of a nation's law is the enormous difficulty of bringing suits to vindicate such abuses. Most likely, the victims cannot sue in the place where the torture occurred. Indeed, in many instances, the victim would be endangered merely by returning to that place. It is not easy to bring such suits in the courts of another nation. Courts are often inhospitable. Such suits are generally time consuming, burdensome, and difficult to administer. In addition, because they assert outrageous conduct on the part of another nation, such suits may embarrass the government of the nation in whose courts they are brought. Finally, because characteristically neither the plaintiffs nor the defendants are ostensibly either protected or governed by the domestic law of the forum nation, courts often regard such suits as "not our business."

The new formulations of the Torture Victim Protection Act convey the message that torture committed under color of law of a foreign nation in violation of international law is "our business," as such conduct not only violates the standards of international law but also as a consequence violates our domestic law. In the legislative history of the TVPA, Congress noted that universal condemnation of human rights abuses "provide[s] scant comfort" to the numerous victims of gross violations if they are without a forum to remedy the wrong. House Report at 3, 1992 U.S.C.C.A.N. at 85. This passage supports plaintiffs' contention that in passing the Torture Victim Prevention Act, Congress has expressed a policy of U.S. law favoring the adjudication of such suits in U.S. courts. If in cases of torture in viola-

tion of international law our courts exercise their jurisdiction conferred by the 1789 Act only for as long as it takes to dismiss the case for *forum non conveniens,* we will have done little to enforce the standards of the law of nations.

This is not to suggest that the TVPA has nullified, or even significantly diminished, the doctrine of *forum non conveniens.* The statute has, however, communicated a policy that such suits should not be facilely dismissed on the assumption that the ostensibly foreign controversy is not our business. The TVPA in our view expresses a policy favoring our courts' exercise of the jurisdiction conferred by the ATCA in cases of torture unless the defendant has fully met the burden of showing that the *Gilbert* factors "tilt[ ] strongly in favor of trial in the foreign forum." *R. Maganlal & Co.,* 942 F.2d at 167.

### (3) *The Forum Non Conveniens Analysis in this Case*

■ We turn to the analysis of the *forum non conveniens* factors in their application to this case. We believe the rule of law applied by the district court was faulty, as noted above, in the following respects: (a) The district court counted against retention of jurisdiction that the plaintiffs were not residents of the Southern District of New York while failing to count in favor of retention that two of the plaintiffs were residents of the United States, and (b) the court failed to count in favor of retention the interest of the United States, as expressed in the TVPA, in providing a forum for the adjudication of claims of torture in violation of the standards of international law. Furthermore, the Magistrate Judge, whose findings were adopted by the district court, gave no consideration to the very substantial expense and inconvenience (perhaps fatal to the suit) that would be imposed on the impecunious plaintiffs by dismissal in favor of a British forum, and the inconvenience to the defendants that ultimately justified the

dismissal seems to us to have been minimal.

Ordinarily, the conclusions of the district court in deciding whether to dismiss for *forum non conveniens* are given substantial deference and are not overturned except on a finding of abuse of discretion. *See, e.g., Peregrine Myanmar Ltd.*, 89 F.3d at 46. On the other hand, where the district court has not applied the correct rule of law, the same deference does not apply. *See, e.g., Guidi*, 224 F.3d at 145 (appellate review encompasses " 'whether the district court reached an erroneous conclusion on ... the law' ") (quoting *R. Maganlal & Co.*, 942 F.2d at 167).

The issue of *forum non conveniens* is not settled by adding to the mix the considerations favoring retention arising from the U.S. residence of two of the plaintiffs and the policy expressed in the TVPA favoring adjudication of claims of torture in violation of international law. If the defendants advanced substantial interests supporting dismissal in favor of a British forum we would either remand to the district court for reconsideration or, if the defendants interests were sufficiently substantial, sustain the dismissal notwithstanding our identification of interests in favor of retention that the district court did not consider.

In our view, however, the defendants have offered only minimal considerations in support of an English forum. This is not a case like *Piper* where there is an obviously better suited foreign forum for the adjudication of the dispute. *See Piper*, 454 U.S. at 238–39, 102 S.Ct. 252 (dismissal of case so that it could be litigated in Scotland, site of plane crash). Nor does it involve substantial physical evidence that is difficult or expensive to transport. *Cf., e.g., id.* at 242–43, 102 S.Ct. 252 (plane crash in Scotland); *In re Union Carbide*, 809 F.2d 195 (environmental disaster in India). For any nonparty witnesses, the inconvenience of a trial in New York is not

significantly more pronounced than the inconvenience of a trial in England.

In arguing that England is a more appropriate forum, defendants rely upon arguments such as the inconvenience of shipping documents from England to the United States and the additional cost for a Nigerian witness of flying to New York rather than London. These considerations are indeed a legitimate part of the *forum non conveniens* analysis, but (a) the defendants have not demonstrated that these costs are excessively burdensome, especially in view of the defendants' vast resources, *cf. Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 969 (2d Cir.1980) (Newman, J., concurring) ("It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit."), and (b) the additional cost and inconvenience to the defendants of litigating in New York is fully counterbalanced by the cost and inconvenience to the plaintiffs of requiring them to reinstitute the litigation in England—especially given the plaintiffs' minimal resources in comparison to the vast resources of the defendants. These considerations cannot justify overriding the plaintiffs' choice of forum.

Defendants argue that England has a public interest in adjudicating this action. In particular, they argue that (1) Shell Transport is a British corporation whose liability for the actions of its subsidiary is likely to be governed by British law; and (2) Nigeria was at the time of the actions in question a member of the Commonwealth of Nations. Although these factors do bear consideration, they are not overriding. To the same extent that England may have an interest in adjudicating matters affecting a British corporation, the United States courts have an interest in adjudicating matters affecting its residents. Also, while one defendant is a British corporation whose actions are governed by British law, the second defendant is not British, but Dutch. The fact that Nigeria was at the time a member of the voluntary

consortium of nations constituting the Commonwealth is of no particular significance.

In order to be granted dismissal based on *forum non conveniens*, the defendants bear the burden of establishing that the *Gilbert* factors "tilt[ ] strongly in favor of trial in the foreign forum." *R. Maganlal & Co.*, 942 F.2d at 167. We believe they have failed as a matter of law to meet this burden. The factors weighing against dismissal include (1) the substantial deference courts are required to give to the plaintiff's choice of forum, (2) the enormous burden, expense, and difficulty the plaintiffs would suffer if required to begin the litigation anew in England,[13] (3) the policy favoring our court's retention of such suits brought by plaintiffs who are residents of the United States, and (4) the policy expressed in the TVPA favoring adjudication of claims of violations of international prohibitions on torture. These factors are more than sufficient to overcome the defendants' weak claim for dismissal based on *forum non conveniens*.[14]

We therefore remand to the district court for further proceedings. Because the district court dismissed for *forum non conveniens*, it never considered the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[15] We remand for consideration of that motion.

## CONCLUSION

For the foregoing reasons, the judgment of the district court dismissing for *forum non conveniens* is REVERSED, and the case is REMANDED for further proceedings.

---

**13.** As the Magistrate Judge noted in his report, the plaintiffs lack meaningful financial resources and will be substantially burdened by the expense of bringing this litigation in England. Nonetheless, he concluded that the plaintiffs' lack of resources is a "neutral factor" because the plaintiffs have not established that it will be less expensive to try the case in New York than in England. The record, however, contains substantial evidence that trial in New York will be less expensive and burdensome for the plaintiffs. The plaintiffs have already obtained excellent pro bono counsel to litigate this matter in the courts of the United States; there is no guarantee that they will be able to obtain equivalent representation in England without incurring substantial expenses. Two of the plaintiffs lived in the United States when the action was brought. The cost and difficulties of relocating themselves to England for the duration of the litigation is likely to be onerous. Finally, the plaintiffs and their attorneys have already made substantial investments of time, money, and energy in pursuing this litigation in the U.S. courts. Requiring the plaintiffs to replicate them in the British courts would substantially increase their burden. For these reasons, we believe that the Magistrate Judge should have given greater consideration to the burden on the impecunious plaintiffs, rather than focusing his consideration of the convenience factors almost entirely on the convenience of the defendants.

**14.** The other considerations favoring retention of jurisdiction sufficiently outweigh the defendants' claim for dismissal that we would reach the same result without consideration of the policy interest we have found to be expressed by the TVPA.

**15.** Defendants also urged below that the Netherlands was an adequate alternative forum and more convenient than the United States. Although the district court did not rule on the defendants' request for dismissal in favor of a Dutch forum, we need not remand for consideration of this question, because dismissal in favor of trial in the Netherlands would share the disadvantages that have led us to reject the dismissal in favor of trial in England.