**Nicholas KLONIS and Mary Klonis, Plaintiffs,**

v.

**NATIONAL BANK OF GREECE, S.A., Defendant.**

**No. 05 Civ. 6289 PKC DF.**

United States District Court, S.D. New York.

March 28, 2007.

Robert Keith Erlander, Law Firm of Robert K. Erlander, New York City, for Plaintiffs.

Michael Thomas Sullivan, Emily Anne Samuels, Sullivan & Worcester LLP, New York City, for Defendant.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

Plaintiffs Nicholas and Mary Klonis, a married couple, have sued the National Bank of Greece, S.A. ("NBG") for failure to pay the principal and interest due on three accounts that plaintiffs opened with the National Mortgage Bank of Greece ("NMBG") in the 1980s. NBG is the defendant in this action because NMBG—which had been a wholly-owned subsidiary of NBG—merged completely into NBG in 1998, and thereafter ceased to exist as a separate entity. Mr. Klonis opened the

first account, a certificate of deposit account, in 1981 in Athens, Greece ("Athens Account" or "CD Account"). While there is some confusion in the submissions to this Court as to the date on which the later accounts were opened, the complaint alleges that plaintiffs opened the two other accounts, both passbook savings accounts, in 1987 in New York ("New York Accounts" or "Passbook Accounts"). Plaintiffs allege that they have never withdrawn the funds deposited into these accounts, and when they tried to do so, NBG refused to pay.

The complaint in this action was filed on July 11, 2005, and alleged breach of contract, fraud and negligence. On May 5, 2006, defendant moved to dismiss the complaint or alternatively for a stay on various grounds, but that motion was withdrawn without prejudice on May 19, 2006. (Docket Nos. 13, 20) On July 11, 2006, defendant filed an amended motion to dismiss or for a stay.[1] Defendant moved to dismiss the complaint in its entirety on the basis of *forum non conveniens* and/or international comity, the latter of which was predicated on a related litigation between the parties in Greece. Alternatively, NBG sought a stay of this action pending the resolution of the Greek action, which had been commenced first. Defendant also sought dismissal under Rule 12(b)(2), Fed. R.Civ.P., of plaintiffs' claim on the Athens Account. NBG admits that it is amenable to personal jurisdiction in New York for claims relating to the New York Accounts.

Discovery was stayed except for that relating to personal jurisdiction. In the briefing on the motion, plaintiffs raised the issue of defendant's compliance with discovery requests and production orders,

and a hearing on those issues was held on December 21, 2006. At the hearing, I set a schedule for supplemental discovery and briefing, and the discovery issues are now resolved.

On December 27, 2006, I entered a Memorandum and Order denying defendant's motion to dismiss or for a stay on the basis of *forum non conveniens* or international comity, but reserved decision on personal jurisdiction until the supplemental discovery and briefing was completed. *See Klonis v. National Bank of Greece, S.A.*, No. 05 Civ. 6289(PKC), 2006 WL 3851146 (S.D.N.Y. Dec. 27, 2006).

Supplemental discovery is now complete, and the parties have submitted supplemental briefing informed by the results of that discovery. For the reasons set forth below, I grant defendant's motion to dismiss for lack of personal jurisdiction over NBG, except to the extent that claims are asserted arising from the Passbook Accounts. The amended motion to dismiss is now resolved in its entirety, and the case will proceed on plaintiffs' breach of contract claims relating to the Passbook Accounts.

## I.  BACKGROUND

Defendant does not contest its amenability to suit in New York with respect to claims arising from the Passbook Accounts, which were opened by plaintiffs with NMBG in New York. The accounts were opened during a time when NMBG was operating a foreign representative office in New York, between the years 1983 and 1992. (Erlanger Decl. Exs. 6, 9) After 1992, NMBG ceased to conduct any banking business in New York, and in 1998 it was absorbed into its corporate parent, NBG.

---

1. The original motion to dismiss asserted grounds for dismissal that were not reasserted in the amended motion, such as failure to properly serve process on NBG under the Hague Convention. NBG withdrew these de-

fenses in exchange for plaintiffs' agreement to withdraw their fraud and negligence claims, which were allegedly time-barred. (Docket Nos. 22–24.) Therefore, only the breach of contract claim remains in the case.

NBG is a financial institution incorporated under the laws of the Hellenic Republic, and is headquartered in Athens, Greece. (Compl. ¶ 4; Erlanger Decl. Ex. 5 at 16) It has never directly conducted any banking business in New York, and consequently NBG argues that it is not generally present here for the purposes of personal jurisdiction under N.Y. C.P.L.R. § 301. NBG also argues that the CD Account, which was opened in Athens, has no connection with New York sufficient to establish long-arm jurisdiction under N.Y. C.P.L.R. § 302.

Plaintiffs concede that there is no basis for long-arm jurisdiction over the CD Account, but seek to establish that NBG is generally present in New York because it is "doing business" here. The primary basis for this claim is that certain of NBG's subsidiaries, which are indisputably present in New York, are allegedly "mere departments" or "agents" of NBG. Therefore, the relevant facts for the purposes of this motion concern NBG's contacts with New York, and its relationship with its subsidiaries that are present here.

As there has been extensive discovery on the issue of personal jurisdiction, the record on this motion goes beyond the complaint. Plaintiffs and defendant have submitted affidavits describing the relationship between NBG and its subsidiaries, as well as NBG's other contacts with New York. The facts as set forth below draw on the undisputed facts in those submissions, and the materials are interpreted in the light most favorable to plaintiffs, the non-movants. *See DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

### A. *NBG's Direct Contacts with New York*

NBG has never directly operated a branch in New York. According to a decla-

ration by Athanassios Panagopoulos, a Deputy Manager of NBG, the corporation does not own or lease any real property in New York, does not regularly conduct meetings in New York, and does not employ officers or staff in New York in its regular course of business. (3/10/06 Panagopoulos Decl. ¶ 7) NBG does have one officer, Thomas O'Brien, who is in New York on a full-time basis, although not in furtherance of NBG's business. O'Brien is also an officer and director of a New York based subsidiary of NBG called the Atlantic Bank of New York ("ABNY"), and his employment here is in furtherance of ABNY's business. (*Id.*) O'Brien is, however, NBG's agent for service of process in the United States. (Erlanger Decl. Ex. 5 at 16)

The record discloses scant other direct contacts between NBG and New York. American Depository Receipts for shares of NBG stock are listed on the New York Stock Exchange ("NYSE"), and NBG retains lawyers and has a depository bank account in New York in connection therewith. (*Id.* at 145) Plaintiffs have supplied the Court with a NBG printed advertisement from a New York newspaper from 1983 that advertised ABNY as NBG's affiliated bank in New York. (Erlanger Decl. Ex. 10) While the record shows that NMBG operated a branch in New York for nine years, plaintiffs reside in and are domiciliaries of Florida, and the record does not indicate that NBG currently maintains NMBG accounts for any New York residents. The parties appear to agree that NBG is maintaining two other NMBG accounts that were presumably opened in New York, but it is not clear who owns those accounts or where the owners reside.

### B. *NBG's Subsidiaries*

The focus of plaintiffs' case for general in personam jurisdiction over NBG in New

York is on NBG's network of subsidiaries that are or were present in New York at the time this action was commenced. According to plaintiffs, Greek banking regulations and historical practices require that Greek financial institutions take the form of several specialized corporations organized around one principal bank. NBG is one such principal bank, and the corporations discussed *infra* are specialized subsidiaries that are part of the so-called "NBG Group." There are three subsidiaries on which discovery has been taken: ABNY, NBG International, Ltd. ("NBGI Ltd.") and NBG International, Inc. ("NBGI Inc."). Of the three, ABNY is most central to plaintiffs' jurisdictional argument.

ABNY is a New York corporation that was a wholly owned subsidiary of NBG when this action was commenced. NBG subsequently sold its interest in ABNY to another, unaffiliated bank. (1/22/07 Panagopoulos Decl. ¶ 17) ABNY is and has always been headquartered in New York. Although there is some confusion in the record, it appears that ABNY and NBG had at most three directors and/or officers in common. As noted, O'Brien was an ABNY officer and director, and also an officer of NBG. Takis Arapoglou was a member of ABNY's Board of Directors, and was also the Chairman, CEO, and a director of NBG. Agis Leopoulos was also a member of ABNY's Board of Directors, and was a General Manager of NBG. The two NBG board members, Arapoglou and Leopoulos, typically attended ABNY board meetings in New York via telephone or video conference. It appears that one final NBG officer, Constantinos Othoneos, attended ABNY board meetings on occasion, although he was neither a director nor officer of ABNY. The number of directors on ABNY's board—of which there were ten when this action was commenced—appears to have been established directly by NBG. (NBG 277) [2]

With respect to the financial and managerial interaction between NBG and ABNY, the record discloses some coordination between the corporations in monitoring credit and market risk. (Erlanger Decl. Ex. 5 at 75–76) NBG has established a "Risk Management Council" for the corporations in the NBG Group to ensure consistent risk management strategies. (*Id.*) While all subsidiaries in the NBG Group are subject to the oversight of the Risk Management Council, each subsidiary, including ABNY, is responsible for crafting its own credit/risk assessment procedures. Each subsidiary separately undertakes the review process on its own. (*Id.*) The record shows that ABNY and NBG had very different internal procedures for risk assessment and management. (*Id.*)

ABNY controls considerable assets in its own name, and those assets are valued in the billions of dollars. (Sullivan Reply Decl. Ex. 1) ABNY meeting minutes from 2004 and 2005 indicate that the subsidiary conducted its own business affairs autonomously. (NBG 245–46, 251–52, 263–65, 270, 276–77, 280) For the year 2004, ABNY earned a pre-tax profit of Q42,979,-000. (NBG 171) The parties dispute the total pre-tax profits for the NBG Group in 2004, with plaintiffs putting the figure at Q261,349,000, while defendant claims the number is Q386,367,000. (Pls. Supp. Br. at 3; Panagopoulos Reply Decl. ¶ 2) In any event, ABNY accounted for either 16.4 or 11.1% of the NBG Group's total profits, depending on whose figures are used.

NBG and ABNY did, on occasion, engage in business transactions between

---

**2.** Citations to "NBG" followed by a page number refer to the stamped numbers on the documents submitted with plaintiffs' supplemental brief on personal jurisdiction.

themselves. In 1999, for instance, ABNY acquired NBG branch banks in Boston and Cambridge, Massachusetts, and Chicago, Illinois. (1/22/07 Panagopoulos Decl. ¶ 12) NBG has also guaranteed various loans made by ABNY over the years, although ABNY was liable to NBG for fees and commissions as it would have been to any other bank. (Panagopoulos Reply Decl. ¶ 3–4) In those transactions, NBG guaranteed third-party debtors for the benefit of ABNY.

The record discloses fewer facts relating to NBGI Ltd. and NBGI Inc., and, although those entities were discussed in the complaint, their significance to plaintiffs' theory of jurisdiction appears to have receded since. NBGI Ltd. is a wholly-owned subsidiary of NBG, and is organized under the laws of England, where it is headquartered. (North Decl. ¶¶ 3–4) NBGI Ltd. is engaged in investment banking, but not in traditional commercial banking. (*Id.* at ¶ 5) The company shares one director in common with NBG, but claims that ethical screens are maintained to avoid potential conflicts of interest. (*Id.* at ¶¶ 8–10) It is not clear what direct contacts, if any, NBGI Ltd. has with New York.

NBGI Ltd. is, however, the parent company of NBGI Inc., which is a Delaware corporation that is headquartered in New York. (Schinkel Decl. ¶ 3) NBGI Inc. is a holding company for two other corporations, NBGI Securities Inc. and NBGI Asset Management. (*Id.* ¶ 7) Facts relating to these companies are not well developed in the record, but it seems that they primarily facilitate U.S. investments in the Athens Stock Exchange. (*Id.* ¶ 9)

## II. *DISCUSSION*

### A. *Plaintiff's Burden to Establish Personal Jurisdiction*

"Motions to dismiss under Rule 12(b)(2) may, in part, test plaintiff's theory of jurisdiction and, in part, test the facts supporting the jurisdictional theory." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 153 (2d Cir.1999). On a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction. *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir.2003) (per curiam). However, the nature of "the plaintiff's obligation varies depending on the procedural posture of the litigation." *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). Prior to discovery, a plaintiff may defeat a Rule 12(b)(2) motion by "pleading in good faith legally sufficient allegations of jurisdiction." *Id.* at 197. Where, as here, "the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held[,] the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited ..., would suffice to establish jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir.1999) (internal quotation marks omitted); *see also Credit Lyonnais*, 183 F.3d at 153 (noting that district courts have " 'considerable procedural leeway' " in deciding Rule 12(b)(2) motions) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981)).

After discovery, a plaintiff "cannot rely merely on conclusory statements or allegations" to defeat a motion to dismiss for lack of personal jurisdiction; rather, "the prima facie showing must be factually supported." *Melnick v. Adelson–Melnick*, 346 F.Supp.2d 499, 502 & n. 17 (S.D.N.Y.2004) (internal quotation marks omitted). Be-

cause the question of personal jurisdiction is "inherently a matter requiring the resolution of factual issues outside of the pleadings ... all pertinent documentation submitted by the parties may be considered in deciding the motion." *St. Paul Fire and Marine Ins. Co. v. Eliahu Ins. Co.*, No. 96 Civ. 7269(MBM), 1997 WL 357989, at *1 (S.D.N.Y. June 26, 1997), *aff'd*, 152 F.3d 920 (2d Cir.1997) (internal quotation marks omitted).

### B. *Personal Jurisdiction in New York*

The Federal Rules of Civil Procedure authorize the exercise of personal jurisdiction in federal court over any defendant "who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located." Rule 4(k)(1)(A), Fed.R.Civ.P. If plaintiffs are able to establish a factual predicate for jurisdiction under the laws of the forum state—here, New York—then the court must consider whether the exercise of jurisdiction violates due process. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 94 (2000). Because I conclude that plaintiffs have not met their burden to offer facts which, if credited, would allow for the exercise of general jurisdiction over NBG in New York, there is no need to engage in the due process analysis.

### 1. *Doing Business in New York*

Under New York's general jurisdiction statute, N.Y. C.P.L.R. § 301, "a foreign corporation is subject to general jurisdiction in New York if it is 'doing business' in the state." *Wiwa*, 226 F.3d at 95. " '[A] corporation is "doing business" and is therefore "present" in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York, "not occasionally or casually, but with a fair measure of permanence and continuity." ' " *Id.* (quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915 (1917)) (alteration in *Wiwa*). The corporation must be engaged in "a continuous and systematic course of 'doing business' here...." *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967). There is no precise test for "doing business" in the state, and courts must look to the "aggregate of the corporation's activities in the State...." *Laufer v. Ostrow*, 55 N.Y.2d 305, 310, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982). There are, however, several traditional factors that courts consider when undertaking this analysis, and they are "whether the company has an office in the state, whether it has any bank accounts or other property in the state, whether it has a phone listing in the state, whether it does public relations work there, and whether it has individuals permanently located in the state to promote its interests." *Wiwa*, 226 F.3d at 98. While a corporation's decision to list its stock on the NYSE is not devoid of jurisdictional significance, such listings and "ancillary steps in support of ... listing" are not sufficient to confer jurisdiction "absent other substantial contacts...." *Id.* at 97–98.

Measured against these standards, NBG is not "doing business" in New York. On the facts of record, the traditional indicia of doing business do not support the conclusion that NBG is present in New York on a continuous and systematic basis. *See Wiwa*, 226 F.3d at 98. NBG does not have offices in the state, there is no evidence to suggest it owns any property in the state, it has no New York phone listings, and it does no public relations work here. While NBG does have one officer, Mr. O'Brien, who is stationed in New York and who is NBG's U.S. agent for service of process, the only evidence relating to his

employment in New York shows that he works here exclusively in furtherance of ABNY's business.

It is true that NBG's American Depository Receipts trade on the NYSE, and NBG does have attorneys here and a depository account in connection with its listing. However, it is well established that such activities are not legally sufficient to establish jurisdiction "absent other substantial contacts...." *Id.* As noted, NBG's other contacts with New York are insubstantial, and do not reveal the types of connections to New York that are required to find that it is doing business in the State.

2. *"Mere Departments" of Foreign Corporations*

■ Under certain circumstances, a foreign corporation may be subject to general jurisdiction in New York on account of its relationship with a subsidiary that is doing business in the state. Under these theories, the foreign parent is said to be doing business here because a domestic entity is either a "mere department" or "agent" of the foreign parent, and so attribution of the subsidiary's contacts to the parent is warranted. *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir.1996).

■ Under New York law, a domestic subsidiary is said to be a "mere department" of a foreign parent when "the activities of the parent show a disregard for the separate corporate existence of the subsidiary...." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984). There are four factors that courts look to in making this determination: (1) common ownership, which is essential; (2) "financial dependency of the subsidiary on the parent corporation"; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive

personnel and fails to observe corporate formalities"; and (4) "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent." *Id.* at 120–122; *see also Jazini v. Nissan Motor Company, Ltd.*, 148 F.3d 181, 184–85 (2d Cir.1998) (quoting same). When engaging in this analysis, it is important to bear in mind that "[t]he officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over the subsidiary corporation and the discharge of that supervision alone is not enough to subject the parent to New York jurisdiction." *Beech Aircraft*, 751 F.2d at 120.

■ Plaintiffs have argued that ABNY and the NBGI corporations are "mere departments" of NBG. With respect to the NBGI corporations, despite the full opportunity to conduct jurisdictional discovery, there is a lack of information on the relationship between NBG and the NBGI corporations in New York; therefore, there is no factual basis on this record to find that those corporations are mere departments of NBG. Conclusory statements are insufficient at this stage of the proceedings.

With respect to ABNY, it is not disputed that the first and necessary factor of common ownership is present—NBG owned 100% of ABNY stock when this action was commenced. Consideration of the other factors, however, does not reasonably support the conclusion that NBG's control over ABNY is more extensive than that usually present in the parent-subsidiary relationship.

First, there is no indication that ABNY is financially dependent on NBG. Its yearly pre-tax profits are in the tens of millions of dollars, and it controls over a billion dollars in assets. The only evidence of financial support whatsoever of ABNY by NBG is that NBG has guaranteed loans

made by ABNY over the years. This service is very different from the type of financial support that courts have relied upon in finding a New York corporation to be "financially dependent" on a foreign parent. For instance, in *Beech Aircraft,* the parent corporation made several no-interest loans to its subsidiary, and the subsidiary could not have stayed in business without the parent's support. 751 F.2d at 121. By contrast, in this case, the record shows that ABNY is a solvent corporation that occasionally does business with its parent; there is nothing in the record to suggest that ABNY is dependent in whole or in part on NBG for its continued existence.

Second, the record does not indicate that NBG interferes with ABNY's selection and assignment of executive personnel, or that ABNY fails to observe corporate formalities. While NBG establishes the number of directors on ABNY's board, the majority of those directors—seven out of ten—are not affiliated with NBG. This overlap is not highly probative of "mere department" status, however, since some amount of overlap between officers and directors of corporations under common ownership is to be expected. *See Beech Aircraft,* 751 F.2d at 121 ("Of course, the officers of a parent normally control the board of directors of a subsidiary in their capacity as representatives of the controlling stockholder."); *see also Jazini,* 148 F.3d at 185; *Porter v. LSB Industries, Inc.,* 192 A.D.2d 205, 213–14, 600 N.Y.S.2d 867 (N.Y.App. Div. 4th Dep't, 1993). The majority of ABNY's board is independent from NBG, and the board observes the corporate "formality" of holding regular meetings, at which the board conducts ABNY's business.

Finally, NBG exercises only minimal control over the marketing and operational policies of ABNY. While the credit and market risk assessment strategies of ABNY are subject to the oversight of the NBG Group's Risk Management Council, ABNY develops its own procedures and engages in its own risk analysis. The minutes from the meetings of the board of directors that have been submitted in connection with this motion reveal that ABNY autonomously conducted its own affairs without any significant intrusion by NBG. There is no evidence that NBG directed ABNY policies to any significant degree.

Therefore, plaintiffs have failed to come forward with evidence which, if credited, could support the conclusion that ABNY is a mere department of NBG.

### 3. *Agency*

To establish that a domestic corporation is an agent for a foreign parent, "the plaintiff must show that the subsidiary 'does all the business which [the parent corporation] could do were it here by its own officials.'" *Jazini,* 148 F.3d at 184 (quoting *Frummer,* 19 N.Y.2d at 537, 281 N.Y.S.2d 41, 227 N.E.2d 851) (alteration in original). This "mean[s] that a foreign corporation is doing business in New York ... when its New York representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar activities." *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 121 (2d Cir. 1967). "To come within the rule, a plaintiff need demonstrate neither a formal agency agreement, nor that the defendant exercised direct control over its putative agent." *Wiwa,* 226 F.3d at 95.

In *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967)—the case which gave rise to this doctrine—a foreign corporation, Hilton (U.K.), was subjected to general jurisdiction in New York because of

the activities of its reservation agent here. In that case, the Hilton Reservation Service ("Service") did "public relations and publicity work for the defendant Hilton (U.K.), including maintaining contacts with travel agents[ ] and tour directors," and generated business for Hilton (U.K.); such booking services were "the very purpose for which [the Service] was established." 19 N.Y.2d at 537, 281 N.Y.S.2d 41, 227 N.E.2d 851 (internal quotations omitted). The Court of Appeals concluded that "the Service [did] all the business which Hilton (U.K.) could do were it here by its officials." *Id.*

The *Frummer* case has been interpreted to require that the "agent" be engaged in activities which are sufficiently important to the foreign corporation's business that the parent would be likely to perform them directly if the domestic entity were unavailable. *Gelfand*, 385 F.2d at 120–21. In *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir.2000), two foreign corporations were found to be present in New York because of an Investor Relations Office ("Office") which was created to facilitate the defendants' relationships with the investment community. *Id.* at 93. Although the Office was nominally owned by one of the defendants' subsidiaries, the Office devoted 100% of its business to the defendants, and the defendants reimbursed the subsidiary for its costs, which totaled over $500,000 per year. *Id.* at 93, 95–96. Since both defendants were "huge publicly-traded companies with a need for access to capital markets," the Court found that the Office's services were sufficiently important that they would have to be performed by the defendants if the Office did not exist. *Id.* at 96.

■ The record in this case does not show that ABNY—or any other subsidiary—is an agent for NBG for the purposes of establishing general jurisdiction. The only evidence proffered by plaintiffs in support of the agency theory is that ABNY has occasionally touted its affiliation with the NBG Group. To the extent that ABNY has advertised its relationship with NBG, however, its advertising has only suggested that ABNY's business is well-positioned to serve customers' international banking needs. The nature of this advertising by ABNY starkly contrasts with that in *Frummer* and *Wiwa*. Those cases featured domestic companies that were established only to market, coordinate, or otherwise facilitate a foreign corporation's business interests in New York. By contrast, the only apparent purpose for ABNY's broadcasting of its affiliation with NBG is to recruit customers *for itself*, not NBG.

More significantly, however, there is no evidence showing that ABNY actually did market any of NBG's services. There is no evidence in the record of any sort which describes the nature of ABNY's marketing of services at all. Plaintiff's only submission in this regard is a newspaper article from 1995, which states:

> Atlantic Bank focuses on businesses that export and import goods, offering shipping-finance services through the National Bank of Greece's network of offices throughout Europe. But it has also been active in providing construction loans to several innovative redevelopment projects in New York City, including a 1991 state-and city-financed project in the Manhattan Valley section of the city's Upper West Side and a "turnkey" project in Harlem.

(Erlanger Decl. Ex. 7) Corresponding to this lack of evidence on ABNY's marketing of NBG's services, there is no evidence to suggest that any marketing done by ABNY was sufficiently important to NBG's business that it would have been here by its own officials had ABNY not existed. In this connection, it is also worth noting that subsequent to the com-

mencement of this action, NBG sold its interest in ABNY, and has not undertaken to perform any of ABNY's functions in its absence. Therefore, the record does not contain evidence which, if credited, could support a finding that ABNY was NBG's agent for jurisdictional purposes in New York.

Therefore, since plaintiffs have failed to show that NBG's contacts with New York are substantial, and have failed to demonstrate that any of NBG's New York subsidiaries may be attributed to NBG for jurisdictional purposes, plaintiffs have failed to meet their burden to prove that NBG was doing business in New York when this action was commenced.

III. *CONCLUSION*

For the foregoing reasons, defendant's motion to dismiss for lack of personal jurisdiction those claims in the complaint relating to the CD Account is granted. The action will proceed before me with respect to the Passbook Accounts, over which personal jurisdiction is conceded.

SO ORDERED.